No. 16-2000

# In the
# United States Court of Appeals
# for the Federal Circuit

---

UNILOC USA, INC., UNILOC LUXEMBOURG S.A.,
*Appellants*,

v.

SEGA OF AMERICA, INC., UBISOFT, INC., KOFAX, INC., CAMBIUM LEARNING GROUP, INC., PERFECT WORLD ENTERTAINMENT, INC.,
*Appellees.*

---

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board, Nos. IPR2014-01453, IPR2015-01026

---

## <u>CORRECTED</u> OPENING BRIEF FOR APPELLANTS UNILOC USA, INC. AND UNILOC LUXEMBOURG S.A.

---

Daniel L. Geyser
*Principal Attorney*
Douglas D. Geyser
725 S. Figueroa Street, Suite 1830
Los Angeles, CA  90017
Tel.:  (213) 995-6811
Fax:  (213) 261-0299
*daniel.geyser@strismaher.com*
*douglas.geyser@strismaher.com*

*Counsel for Appellants*

No. 16-2000

# In the
# United States Court of Appeals
# for the Federal Circuit

---

Uniloc USA, Inc., Uniloc Luxembourg S.A.,
*Appellants*,

v.

SEGA of America, Inc., Ubisoft, Inc., Kofax, Inc., Cambium Learning Group, Inc., Perfect World Entertainment, Inc.,
*Appellees.*

---

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board, Nos. IPR2014-01453, IPR2015-01026

---

## CERTIFICATE OF INTEREST

---

Pursuant to Fed. Cir. R. 47.4, counsel for Appellants Uniloc USA, Inc. and Uniloc Luxembourg S.A. certifies the following:

1. The full name of every party or amicus represented by me is:

   Uniloc USA, Inc. and Uniloc Luxembourg S.A.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   None.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

None.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

**Etheridge Law Group**: Brett Mangrum

**Daniel L. Geyser** (a partner of Stris & Maher LLP, but Stris & Maher LLP is not participating in this appeal, and Mr. Geyser represents Uniloc outside his capacity at the firm)

**Douglas D. Geyser** (an attorney at Stris & Maher LLP, but Stris & Maher LLP is not participating in this appeal, and Mr. Geyser represents Uniloc outside his capacity at the firm).

**Uniloc USA, Inc.**: Sean D. Burdick

Respectfully submitted.

/s/ *Daniel L. Geyser*
Daniel L. Geyser
  *Principal Attorney*
725 S. Figueroa Street, Suite 1830
Los Angeles, CA  90017
Tel.:  (213) 995-6811
Fax:  (213) 261-0299
*daniel.geyser@strismaher.com*

*Counsel for Plaintiffs-Appellants Uniloc USA, Inc. and Uniloc Luxembourg S.A.*

October 13, 2016

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ........................................................................1

STATEMENT OF THE ISSUES.............................................................................1

STATEMENT OF THE CASE.................................................................................3

SUMMARY OF ARGUMENT ................................................................................7

STANDARD OF REVIEW ...................................................................................10

ARGUMENT ........................................................................................................11

    I.    THE BOARD'S PRIORITY RULING IS INCORRECT, AND UNILOC IS ENTITLED TO THE FILING DATE OF THE AUSTRALIAN PROVISIONAL APPLICATIONS ..........................11

        A.    The Board Clearly Erred By Applying The Wrong Legal Standard ...................................................................................11

        B.    Applying The Correct Standard, The Australian Provisionals Adequately Describe The Full Scope Of The Claimed Invention....................................................................13

            1.    The Australian provisionals adequately described the unique ID "generating means" ..................................13

            2.    The Australian provisionals adequately described the "mode switching means" ..........................................35

        C.    Reversal is proper without any further remand .......................39

    II.    THE BOARD'S DETERMINATION THAT THE PATENT'S CLAIMS ARE ANTICIPATED OR OBVIOUS IN LIGHT OF SCHULL IS LEGALLY AND FACTUALLY UNAVAILING ........40

        A.    Schull Is Not Prior Art .............................................................41

        B.    Schull Fails To Teach "Generating Means" Because It Does Not Disclose A Summation Algorithm ...........................41

# TABLE OF CONTENTS
## (continued)

<u>**Page**</u>

      1.    Schull expressly relies on concatenation to generate a Passwordable ID, and summation is not explicitly or inherently disclosed in concatenation ........42

      2.    Schull's limited use of a checksum does not explicitly or inherently disclose a summation algorithm ........................................................................45

III.    THESE AGENCY PROCEEDINGS ARE INFECTED WITH CONSTITUTIONAL AND ADMINISTRATIVE-LAW ERRORS ..........................................................................47

    A.    The Board's Inter Partes Review—Especially As Applied To An *Expired* Patent—Is Unconstitutional Under Article III And The Seventh Amendment.................................47

    B.    These Proceedings Are Invalid In Light Of The Director's Unlawful Delegation Of The Institution Function To The Board............................................................49

CONCLUSION .....................................................................49

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Application of Voss*, 557 F.2d 812 (C.C.P.A. 1977)................................................27

*Application of Wertheim*, 541 F.2d 257 (C.C.P.A. 1976)........................................25

*Arendi S.A.R.L.* v. *Apple Inc.*, No. 2015-2073, 2016 WL 4205964 (Aug. 10, 2016) ....................................................................... 10, 38, 39, 46

*Ariad Pharm., Inc.* v. *Eli Lilly & Co.*, 598 F.3d 1336 (2010) ......................... *passim*

*Aristrocrat Tech. Australia Pty Ltd.* v. *Int'l Game Tech.*, 521 F.3d 1328 (Fed. Cir. 2008) .................................................................................21

*Atmel Corp* v. *Information Storage Devices, Inc.*, 198 F.3d 1374 (Fed. Cir. 1999) ........................................................................... 13, 21

*Bilstad* v. *Wakalopulos*, 386 F.3d 1116 (Fed. Cir. 2004) ................................ 16, 17

*Biomedino, LLC* v. *Waters Tech. Corp.*, 490 F.3d 946 (Fed. Cir. 2007) ...............21

*Brookhill-Wilk 1, LLC* v. *Intuitive Surgical, Inc.*, 334 F.3d 1294 (Fed. Cir. 2003) .................................................................................16

*Capon* v. *Eshar*, 418 F.3d 1349 (Fed. Cir. 2005) ........................................... *passim*

*Cutsforth, Inc.* v. *MotivePower, Inc.*, 636 F. App'x 575 (Fed. Cir. 2016) ....... 38, 47

*Ethicon Endo-Surgery, Inc.* v. *Covidien LP*, 812 F.3d 1023 (Fed. Cir. 2016)................................................................................49

*Finisar Corp.* v. *DirecTV Group*, 523 F.3d 1323 (Fed. Cir. 2008) ........................24

*Gentry Gallery, Inc.* v. *Berkline Corp.*, 134 F.3d 1473 (Fed. Cir. 1988) ......... 24, 31

*George Hyman Const. Co.* v. *Brooks*, 963 F.2d 1532 (D.C. Cir. 1991).................39

*Glaverbel Societe Anonyme* v. *Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550 (Fed. Cir. 1995).................................................................40

*Granfinanciera, S.A.* v. *Nordberg*, 492 U.S. 33 (1989)..........................................48

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Hybritech Inc.* v. *Monoclonal Antibodies, Inc.*, 802 F.2d 1367 (Fed. Cir. 1986)................................................................................................22

*In re Baird*, 16 F.3d 380 (Fed. Cir. 1994)..................................................26

*In re Baker Hughes Inc.*, 215 F.3d 1297 (Fed. Cir. 2000).......................39

*In re Buchner*, 929 F.3d 660 (Fed. Cir. 1991) ..........................................34

*In re Dossel*, 115 F.3d 942 (Fed. Cir. 1997)...................................... 20, 37

*In re Giannelli*, 739 F.3d 1375 (Fed. Cir. 2014)................................. 10, 13

*In re Kotzab*, 217 F.3d 1365 (Fed. Cir. 2000) ..........................................38

*In re Mouttet*, 686 F.3d 1322 (Fed. Cir. 2012) .........................................10

*In re Peters*, 723 F.2d 891 (Fed. Cir. 1983)..............................................27

*In re Rasmussen*, 650 F.2d 1212 (C.C.P.A. 1981)....................................28

*In re Skvorecz*, 580 F.3d 1262 (Fed. Cir. 2009)........................................40

*Joy Techs.* v. *Manbeck*, 959 F.2d 226 (Fed. Cir. 1992)............................48

*Lampi Corp.* v. *Am. Power Prods., Inc.*, 228 F.3d 1365 (Fed. Cir. 2000) ..............27

*Lockwood* v. *Am. Airlines, Inc.*, 107 F.3d 1565 (Fed. Cir. 1997).................... 13, 29

*MCM Portfolio LLC* v. *Hewlett-Packard Co.*, 812 F.3d 1284 (Fed. Cir. 2015)................................................................................................48

*PIN/NIP, Inc.* v. *Platte Chem. Co.*, 304 F.3d 1235 (Fed. Cir. 2002).......................31

*Power Integrations, Inc.* v. *Lee*, 797 F.3d 1318 (Fed. Cir. 2015) .............. 10, 38, 46

*Rambus Inc.* v. *Rea*, 527 F. App'x 902 (Fed. Cir. 2013).................................. 38, 40

*Rowe* v. *Dror*, 112 F.3d 473 (Fed. Cir. 1997)...........................................40

*Schwarz Pharma, Inc.* v. *Warner-Lambert Co.*, 95 F. App'x 994 (Fed. Cir. 2004) .......................................................................................16

*SkinMedica, Inc.* v. *Histogen Inc.*, 727 F.3d 1187 (Fed. Cir. 2013).......................34

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Smith & Nephew, Inc.* v. *Rea*, 721 F.3d 1371 (Fed. Cir. 2013)................................39

*Stern* v. *Marshall*, 564 U.S. 462 (2011)....................................................................48

*Synthes USA, LLC* v. *Spinal Kinetics, Inc.*, 734 F.3d 1332 (Fed. Cir. 2013).............................................................................................................................31

*Tobinick* v. *Olmarker*, 753 F.3d 1220 (Fed. Cir. 2014)...........................................26

*Typhoon Touch Techs., Inc.* v. *Dell, Inc.*, 659 F.3d 1376 (Fed. Cir. 2011).............37

*Uniloc USA, Inc.* v. *Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011) ........... *passim*

*Union Oil Co. of Cal.* v. *Atl. Richfield Co.*, 208 F.3d 989 (Fed Cir. 2000)...... 13, 25

*Upjohn Co.* v. *Mova Pharm. Corp.*, 225 F.3d 1306 (Fed. Cir. 2000) .....................34

*Vas-Cath Inc.* v. *Mahurkar*, 935 F.2d 1555 (Fed. Cir. 1991)..................................19

## Statutes

28 U.S.C. 1295(a)(4)(A) ............................................................................................1

35 U.S.C. 103 ...........................................................................................................26

35 U.S.C. 112, ¶ 1 ............................................................................................ *passim*

35 U.S.C. 112, ¶ 6 ............................................................................................ *passim*

35 U.S.C. 119 ...................................................................................................... 1, 11

35 U.S.C. 120 .................................................................................................. 1, 8, 11

35 U.S.C. 141(c) ........................................................................................................1

35 U.S.C. 142 ............................................................................................................1

35 U.S.C. 311 ............................................................................................................1

35 U.S.C. 314(b) .................................................................................................. 3, 49

35 U.S.C. 316(c) .................................................................................................. 3, 49

35 U.S.C. 318(a) ........................................................................................................1

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

**Regulations**

37 C.F.R. 42.4(a) ................................................................................................. 49

37 C.F.R. 90.3(a)(1) ............................................................................................. 1

## STATEMENT OF RELATED CASES

Pursuant to Fed. Cir. R. 47.5, Appellants Uniloc USA, Inc., and Uniloc Luxembourg S.A. (Uniloc) respectfully submit that:

(a) There have been no other previous appeals in this case.

(b) There are three related cases (or sets of cases) that may directly affect or be directly affected by this Court's decision in the pending appeal. First, *Kofax, Inc.* v. *Uniloc USA, Inc.*, No. 16-2407 (Fed. Cir.), involves a related challenge to another PTAB proceeding challenging the validity of the same patent. Second, *Ethicon Endo-Surgery, Inc.* v. *Covidien LP*, No. 16-366 (U.S.), involves an administrative-law challenge to a parallel AIA proceeding; the petition is still pending at the Supreme Court of the United States, and it raises an issue that Uniloc has asserted here in order to preserve it for further review. And third, there are a related set of cases pending in the United States District Court of the Eastern District of Texas that have been stayed pending the disposition of this appeal and related issues.

## JURISDICTIONAL STATEMENT

The U.S. Patent Trial and Appeal Board (Board) had jurisdiction under 35 U.S.C. 311, and this Court has jurisdiction under 28 U.S.C. 1295(a)(4)(A) and 35 U.S.C. 141(c). The notice of appeal was filed on May 3, 2016, after the final written decision under 35 U.S.C. 318(a) was entered on March 10, 2016. Under 35 U.S.C. 142 and 37 C.F.R. 90.3(a)(1), Uniloc's appeal is timely.

## STATEMENT OF THE ISSUES

This case involves one of the most innovative systems for combating software piracy in the past quarter century. The '216 patent embodies the invention of a pathmarking software-registration system, which includes, among other components, a "licensee unique ID generating means" and a "mode switching means"—both means-plus-function terms. The Board invalidated the patent as anticipated by another patent (Schull), and in doing so, it first rejected Uniloc's argument that Schull was not prior art because the '216 patent claims priority to two earlier Australian provisional applications.

To claim priority to a parent application, a patentee must satisfy the written-description requirement of 35 U.S.C. 112, ¶ 1; see 35 U.S.C. 119, 120. That requirement demands only that the parent's disclosure reasonably convey to a POSITA that the inventor possessed the invention as of the filing date. The Board, however, ignored the statutory text and channeled *paragraph 6* of Section 112,

denying priority because the provisionals did not explicitly disclose the '216 patent's "specific" structure or an "equivalent." First, the Board found that the '216 patent's generating means of "combin[ation] by addition" was not adequately described by the provisionals' disclosure of an algorithm that "combines information" by having certain data "added" to other data. Second, the Board found that the mode-switching means' structure of "program code" was not adequately described by the provisionals' disclosure of a "security routine" "attachable to software" inside the user's computer.

The questions presented are:

1. a. Whether the Board applied the wrong legal standard for priority by asking whether the provisionals disclosed the specific structures (or equivalents) in the '216 patent, instead of asking whether the provisionals reasonably conveyed to skilled artisans that the inventor in fact had possession of the claimed invention at the earlier date.

b. Whether, even if the Board's more restrictive priority test fit the statutory text, substantial evidence supports its conclusion that the provisionals did not adequately describe the '216 patent.

2. Whether the Board could properly determine that Schull rendered the patented claims anticipated or obvious (i) without even confronting multiple, critical arguments advanced by Uniloc during the administrative proceedings; or

(ii) without finding each element expressly or inherently disclosed in the so-called prior art.

3. a. Whether the Board's inter partes review violates Article III and the Seventh Amendment of the U.S. Constitution by allowing Article I judges to adjudicate the validity of an issued patent that has since expired—and is only relevant in infringement litigation between private parties.

b. Whether the USPTO Director's decision to delegate to the Board the decision whether to institute IPR proceedings violates Congress's command that the Director (not the Board) "shall determine whether to institute" an IPR while the Board (not the Director) "shall * * * conduct" such review. 35 U.S.C. 314(b), 316(c).

## STATEMENT OF THE CASE

1. This case arises out of the most preeminent, groundbreaking work for protecting software and avoiding piracy over the last two decades. In 1992, Frederic "Ric" Richardson, one of Australia's most creative inventors, sought patent protection on the software-activation system that eventually became the '216 patent. See Appx3019-3026. Richardson was in search of a technical solution to combat the widespread problem of casual copying that was inhibiting worldwide sales in the music and software industries, cutting into sales by approximately 50%. Appx3045. His breakthrough came with the idea of a "licensee unique ID"—a spe-

cial registration number generated by mathematically combining user data, software data, and computer-hardware data.

The concept was simple and brilliant: by employing an identical algorithm on the user's computer and the registration server, and combining information unique to the user into a single "unique ID," companies could license their software to individuals without modifying individual copies with unique hardwired registration numbers, or preventing users from trying software in demo modes before purchase. This would let users share and download software without incurring costs, but also prevent users from taking advantage of full functionality ("use mode") without purchasing an individual license. The technology has been licensed by industry giants IBM and Microsoft, and is today the most widely used anti-piracy software activation system in the world. Appx3077; Appx504.

Claim 19 is illustrative:

A remote registration station incorporating remote licensee unique ID generating means, said station forming part of a registration system for licensing execution of digital data in a use mode, said digital data executable on a platform, said system including local licensee unique ID generating means, said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID generated by said local licensee unique ID generating means has matched a licensee unique ID generated by said remote licensee unique ID generating means; and wherein said remote licensee unique ID generating means comprises software executed on a platform which includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID.

Appx106 (15:1:21-16:19); see also *Uniloc USA, Inc.* v. *Microsoft Corp.*, 632 F.3d 1292, 1296-1297 (Fed. Cir. 2011) (describing background).

The '216 patent has been one of the most commercially successful—and closely scrutinized—U.S. patents to have been granted in the past quarter century. Its validity has been upheld in multiple reexamination proceedings, in litigation against powerful institutional defendants, and even on appeal before this Court. It has been repeatedly challenged in post-grant reviews (four more times), and some of those challenges remain ongoing—even though the patent has since expired. It has overcome attacks involving over 150 prior-art references, and it has been up-held against the very reference (Schull) that the Board found invalidating in this case. See Appx503-504 (reciting history).

2. Petitioners sought to challenge all claims of the '216 patent in this IPR proceeding. The Board granted review, and joined the proceeding with another IPR case raising an identical set of issues. Appx2.

For purposes of this appeal, two concepts in the patent are critical. The first is the meaning of the "licensee unique ID generating means." This term has been construed as a means-plus-function term: The "function" is "to generate a local or remote licensee unique ID"; the "structure" is "a summation algorithm or a sum-mer and equivalents thereof." Appx10. The second key term is "mode switching means": The "function" is "to permit the digital data or software to run in a use

mode if the locally generated licensee unique ID matches with the remotely gener-ated licensee unique ID"; the "structure" is "program code which performs a com-parison of two numbers or a comparator and equivalents thereof." *Ibid.*

3. After briefing and a hearing, the Board ultimately concluded that all claims in the '216 patent were unpatentable. It found claims 1-11 and 17-20 antici-pated or obvious under Schull, a patent that was filed *after* the inventor filed his provisional applications in Australia, but before the '216 patent was filed in the United States. According to the Board, the '216 patent could not claim priority to the earlier filings, because those provisionals lacked two elements of "structure" found in the '216 patent: it was found to lack (i) a "summation" algorithm; and (ii) "program code" for performing the "mode switching means" (*i.e.*, for deter-mining if the registration-number algorithm on the local computer and the registra-tion server produced a match).

Having determined that Schull was prior art, the Board then found that the subject claims were anticipated or obvious. There was only one point of dispute between the parties: whether Schull disclosed a "summation algorithm" for compu-ting its version of the "licensee unique ID generating means." Despite not mention-ing summation anywhere in Schull—it specifically called for "concatenating" three numbers together—the Board determined that Schull *inherently* disclosed a sum-mation algorithm. On that basis, it invalidated the core of the '216 patent.

This appeal followed.

## SUMMARY OF ARGUMENT

This IPR proceeding was infected with a series of critical legal and factual errors. It ultimately invalidated a groundbreaking patent that had previously withstood vigorous challenges from multiple parties. The Board's decision was wrong, and its decision should be reversed.

1. According to the Board, the '216 patent cannot claim priority to the Australian provisionals. There was no dispute that the provisionals disclosed every core feature of Uniloc's groundbreaking invention. They described, in full, the critical concepts and functionality of the "software registration system," and did so with sufficient detail to enable any POSITA to immediately practice the claimed invention.

Instead, the Board rejected priority because the provisionals' disclosure supposedly lacked "structure": in two particular respects, the '216 patent employed means-plus-function terms (under 35 U.S.C. 112, ¶ 6), and the structure for those terms was supposedly missing in the provisionals. Because "the structures identified in the District Court claim construction for performing the corresponding functions" were "not present," the Board declared the earlier priority dates unavailable.

The Board erred as a matter of law. The priority issue is governed by statute, and the pertinent provisions require parties to satisfy 35 U.S.C. 112, ¶ 1, *not* 35 U.S.C. 112, ¶ 6. See 35 U.S.C. 120 (requiring "disclos[ure] in the manner provided by section 112(a)"—its *first paragraph*—"other than the requirement to disclose the best mode") (emphasis added). It makes no difference whether the provisionals lacked "structure"; the operative inquiry is whether they had an *adequate written description*. Structure is relevant in limiting the scope of functional *claiming*, but priority is all about disclosure and enablement, *not* the claims themselves. It asks whether the written description reveals that the inventor truly conceived of the invention as of the earlier date. Had the Board applied the controlling statute, it would have rejected petitioners' challenge. But it instead effectively asked whether Uniloc satisfied Section 112, ¶ 6, in a provisional application—a question legally irrelevant to determining priority. That error was outcome-determinative, and it warrants reversal.

Moreover, the provisionals plainly satisfy the *relevant* test.

As for "generating means": They plainly disclosed a summation algorithm (or its equivalent) in instructing users to "combine[]" information by "add[ing]" data to other data. Those words are most readily construed as requiring summation; at a minimum, they plainly encompass summation, which is why any POSITA

would immediately conclude that summation fit comfortably within the four corners of the written disclosure.

As for "mode switching means": The Board found that the provisionals used terms that are "interchangeabl[e]" with "program code," yet inexplicably ruled that the provisionals failed to disclose the required "structure, namely, program code." This is puzzling. The only "missing" item was the phrase "program code"—in an invention describing an algorithm, attached to software, activated without the user's knowledge, operating inside a user PC (*i.e.*, *inside a computer*), to provide automatic access to software or prompt a user dialogue box—*all on a computer*. It is an absolute mystery what else this could possibly reference aside from program code. Indeed, neither the Board nor petitioners even suggested *any* plausible alternative—and Uniloc is unaware of any that exist.

2. The Board plainly erred in invalidating Uniloc's groundbreaking claims on the strength of Schull. For one, Schull is not even prior art. For another, Schull embraced *concatenation*, not summation. It nowhere expressly disclosed each element of any claim, and Schull could readily be practiced without employing any addition. The Board simply refused to grapple with Uniloc's key arguments, and adopted findings that were demonstrably at odds with the factual record.

3. These IPR proceedings are invalid for two separate reasons. The first is that they violate Article III and the Seventh Amendment by forcing parties to adju-

dicate their vested rights (an issued patent) before a non-Article III tribunal. This violation is especially pronounced in the context of an *expired* patent: because the patent has no force going forward, these proceedings are only relevant to civil infringement litigation between purely private parties. Congress cannot delegate the disposition of that kind of private dispute outside the judicial branch.

And these proceedings are also invalid because the Director unlawfully delegated her statutory authority to institute proceedings to the Board. Congress deliberately bifurcated these actions, and the Director cannot unwind Congress's decision by assigning her own duties to a different tribunal.

## STANDARD OF REVIEW

The Board's decision is reviewed under the strictures of the Administrative Procedure Act. The Court reviews the Board's legal conclusions de novo and its factual findings for substantial evidence. *E.g.*, *In re Giannelli*, 739 F.3d 1375, 1378-1379 (Fed. Cir. 2014). "'Substantial evidence is something less than the weight of the evidence but more than a mere scintilla of evidence.'" *Arendi S.A.R.L.* v. *Apple Inc.*, No. 2015-2073, 2016 WL 4205964, at *4 (Aug. 10, 2016) (quoting *In re Mouttet*, 686 F.3d 1322, 1331 (Fed. Cir. 2012)). "[T]he board is obligated not only to come to a sound decision, but to fully and particularly set out the bases upon which it reached that decision." *Power Integrations, Inc.* v. *Lee*, 797 F.3d 1318, 1323 (Fed. Cir. 2015).

# ARGUMENT

## I. THE BOARD'S PRIORITY RULING IS INCORRECT, AND UNILOC IS ENTITLED TO THE FILING DATE OF THE AUSTRALIAN PROVISIONAL APPLICATIONS

### A. The Board Clearly Erred By Applying The Wrong Legal Standard

The '216 patent properly claims priority to the Australian provisionals, and the Board's contrary determination was meritless. According to the operative statute (which the Board failed to cite or discuss), a patentee seeking priority must show that the parent "disclosed [the patent] in the manner provided by section 112(a) (other than the requirement to disclose the best mode)." 35 U.S.C. 120; see 35 U.S.C. 119 (adopting Section 120's requirements for foreign-patent applications). Under paragraph one of Section 112, "[t]he specification shall contain a written description of the invention." 35 U.S.C. 112, ¶ 1. That merely requires a disclosure that "reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (2010) (en banc).[1]

---

[1] Petitioners did not challenge the "enablement" component of paragraph one, and the Board did not address it. See, *e.g.*, Appx386 (arguing that "the disclosure of each earlier application fails to satisfy the written description requirements of 35 U.S.C. § 112 ¶ 1"). In any event, the invention was clearly enabled: any POSITA easily could have practiced the invention without *any* experimentation by employing well-known algorithms, including the summation algorithm explicitly disclosed by the applications' plain text. And for the same reasons that the provisionals

[Footnote continued on next page]

In rejecting Uniloc's priority argument, the Board applied the wrong legal standard. Although it briefly referenced the relevant test, it immediately shifted to focusing entirely on structure—and engaging in the *distinct* inquiry under Section 112, ¶ 6. It accordingly looked myopically at whether *specific structure* was disclosed in the provisionals, rather than asking whether the disclosure "reasonably conveyed" that Uniloc had conceived of the invention. It thus faulted the provisionals, for example, for having only "a generalized description" of the algorithm, one that does not "necessarily" require "binary addition." Appx62. And it ultimately stressed that the provisionals "do not convey the *specific algorithm* disclosed in the sixth embodiment, namely, combination by addition, *nor an equivalent*." Appx20 (emphases added); see also *id.* at 22 (as to "mode switching means," holding that the provisionals failed to disclose that "program code, or an *equivalent*, is the *structure* that performs the mode switching means function") (emphases added).

Those conclusions may answer the question posed by *paragraph six* of Section 112, but not paragraph one. It is the means-plus-function test of the sixth paragraph that requires the disclosure of "specific structure" or an equivalent. *Atmel*

_____

[Footnote continued from previous page]

clearly described the invention, they also enabled its use. In order to avoid repetition, Uniloc focuses only on the written-description requirement in the text, but the same logic applies equally to all relevant aspects of paragraph one.

*Corp* v. *Information Storage Devices, Inc.*, 198 F.3d 1374, 1382 (Fed. Cir. 1999); see *ibid.* (stating that to comply with paragraph six, one must "recite some structure corresponding to the means in the specification"). That level of detail is necessary to put parties on notice of the scope of the claims. The priority test, by contrast, asks whether the inventor conceived of the invention—a standard that can be satisfied with disclosures at a higher level of generality clearly encompassing the structure ultimately claimed.

As explained below, had the Board applied the correct standard, it would have reached the opposite result. Its legal error is dispositive and warrants reversal. *In re Giannelli*, 739 F.3d 1375, 1380-81 (Fed. Cir. 2014) (reversing the Board for making the wrong "inquiry").

**B.    Applying The Correct Standard, The Australian Provisionals Adequately Describe The Full Scope Of The Claimed Invention**

**1.    The Australian provisionals adequately described the unique ID "generating means"**

A. 1. The operative inquiry under 35 U.S.C. 112, ¶ 1—the *correct* standard—is clear: there must simply be "sufficient description to show one of skill in the [relevant] art that the inventor possessed the claimed invention at the time of filing." *Union Oil Co. of Cal.* v. *Atl. Richfield Co.*, 208 F.3d 989, 997 (Fed Cir. 2000); see, *e.g.*, *Lockwood* v. *Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997) ("[A] prior application itself must describe an invention, and do so in suffi-

13

cient detail that one skilled in the art can clearly conclude that the inventor invent-ed the claimed invention as of the filing date sought."). Whereas "[c]laims define and circumscribe, the written description discloses and teaches." *Ariad Pharm.*, 598 F.3d at 1347. "We have made clear that the written description requirement does not demand either examples or an actual reduction to practice; a constructive reduction to practice that in a definite way identifies the claimed invention can sat-isfy the written description requirement." *Id.* at 1352.

Assessed under this proper framework, the Australian provisionals readily taught the '216 patent's novel system for software registration, including its "gen-erating means." They disclose that the "registration number algorithm *combines information* entered by a prospective registered user unique to that user with a seri-al number generated from information provided by the environment in which the software to be protected is to run." Appx199 (emphasis added); accord Appx213. And figures in both applications further elaborated what this means: "Registration number generated from user details *added* to Serial number and then encrypted and re-arranged." Appx208 (emphasis added); accord Appx227.

The uncontroverted testimony established that a POSITA would understand these disclosures to encompass summation, and the Board never truly suggests otherwise. Initially, the language means what it plainly says: one way to "com-bine" multiple numbers is to "add" the numbers together. Uniloc's expert con-

firmed this unremarkable construction, citing language directly from multiple dictionaries: a POSITA would have understood the provisionals to teach "an algorithm that uses addition to combine two numbers to arrive at a Licensee Unique ID, and that this algorithm would be 'fairly capable of categorization as a summation algorithm.'" Appx3323-3325. Although Dr. Madisetti, petitioners' expert, testified that the disclosures were not *limited* to summation, he did not dispute that summation *could be included* in those methods. Appx3420 (agreeing that "[i]t is possible" that "[a]mong those ways, summation would be included in at least some of them").[2]

In adopting Dr. Madisetti's testimony, the Board agreed that "the word 'add' does not *necessarily* mean 'sum'"—indicating that it still *can* mean sum—and the Board found "that there is more than one way to combine information." Appx19 (emphasis added). But even if there are multiple ways to combine information, summation is indisputably one such option. The question is not whether summation was *explicitly* disclosed (as paragraph six requires), but rather whether the dis-

_____

[2] He also stated that summation was "not disclosed," *ibid.*, but, like the Board, he was asking the wrong question—he thought that the provisional applications must explicitly specify summation (or do so *to the exclusion* of other methods), rather than simply asking if a POSITA would reasonably understand that the inventor conceived of the invention (including summation as an obvious means of practicing the algorithm under its "generalized description," Appx20). As explained above, that misunderstands the law.

closure made clear that the inventor had conceived of the invention. Summation was an obvious way to implement those instructions, and every POSITA would immediately realize that the person conceiving of the entire groundbreaking system would have understood summation fell within its broad descriptions. That was the relevant inquiry, and the Board would have been compelled to reach the opposite conclusion had it applied the correct standard. Cf., *e.g.*, *Bilstad* v. *Wakalopulos*, 386 F.3d 1116, 1122-1123 (Fed. Cir. 2004) ("Because all of the definitions are consistent with the Bilstad disclosure, the term 'plurality' when construed in view of the Bilstad disclosure is entitled to the full extent of its ordinary meaning."); *Schwarz Pharma, Inc.* v. *Warner-Lambert Co.*, 95 F. App'x 994, 999 (Fed. Cir. 2004) (stating that court ordinarily should "'give the claim term its full breadth of ordinary meaning as understood'" by a POSITA, and concluding that, "[i]n the absence of any intrinsic evidence of a disavowed or disclaimed scope of coverage, and without words or expressions of manifest exclusion or restriction representing a clear disavowal of claim scope of the term," "the broad definition of the term [] stands") (quoting *Brookhill-Wilk 1, LLC* v. *Intuitive Surgical, Inc.*, 334 F.3d 1294, 1301-1302 (Fed. Cir. 2003)).

2. The disclosure is also sufficient looking to the traditional factors this Court assesses when evaluating a written description: "the level of detail required to satisfy the written description requirement varies depending on the nature and

scope of the claims and on the complexity and predictability of the relevant technology." *Ariad*, 598 F.3d at 1351; see, *e.g.*, *Capon* v. *Eshar*, 418 F.3d 1349, 1357 (Fed. Cir. 2005).

This Court already made clear that "the summation structure was [not] critical" to the licensee unique ID generating means. *Microsoft*, 632 F.3d at 1305. Rather, "the importance of the algorithm is only that it be 'adapted to generate a registration number which is unique to an intending licensee.'" *Ibid.* (quoting Appx 99:66-67). As the Court recognized, the precise details of the algorithm are "relative[ly] unimportant[]." *Ibid.* Section 112, ¶ 1 requires only that the patentee reasonably convey that he possessed the invention. It would be bizarre to say that Uniloc did not possess the core invention because it failed to include excessive details on a common feature that was not critical to the invention.

Moreover, "[t]he predictability or unpredictability of the science" also directly undercuts the Board's decision. *Capon*, 418 F.3d at 1360 (describing this factor as "relevant to deciding how much experimental support is required to adequately describe the scope of an invention"). This feature of the patented technology—the algorithm—is undeniably predictable. See also, *e.g.*, *Bilstad*, 386 F.3d at 1125 (explaining that more disclosure is needed if "the art is unpredictable"). It takes virtually *no* expertise to combine numbers by addition; any POSITA with any minimal skill could easily read this description and understand, instantly, that

summation was covered by the disclosure—the only plausible question is whether *other* forms of "combining" numbers were also included. While such questions might be relevant under paragraph six, they are most certainly not relevant under paragraph one: all that matters is that the disclosure encompassed summation (as an obvious option), reasonably showing that the inventor possessed the full invention at the time of the disclosure (read: he would have thought of adding numbers together, just as he said in the plainest terms).

In short: Crafting an algorithm to "combine" numbers by adding one to another was hardly a difficult or novel concept. The disclosure was more than adequate to convey that the inventor indeed conceived of the unremarkable idea of adding these numbers together.

Finally, as this Court already found, this aspect of the '216 patent is not even important to the true invention. There was no reason to disclose "summation" in depth because it was already obvious to everyone and it was virtually immaterial to the claimed invention. What truly mattered was the registration number algorithm would combine the different kinds of information into a single licensee unique ID. Uniloc's contribution to the field was not *how* those numbers were calculated, but the concept of employing a single algorithm that could be replicated locally and remotely to produce the same unique ID—*i.e.*, the groundbreaking "software registration system." *Microsoft*, 632 F.3d at 1296. The provisionals therefore disclosed

18

exactly what was necessary: an algorithm for combining numbers to achieve the desired function. *See id.* at 1305. That "generic" description indisputably encompassed summation (even if it *also* encompassed other methods), and that alone established that the inventor unquestionably conceived of the invention. *See Capon*, 418 F.3d at 1360 ("'[T]he certainty required of the disclosure is not greater than that which is reasonable, having due regard to the subject matter involved.'") (citation omitted).

3. The sufficiency of the provisionals' disclosure becomes even clearer in light of Section 112, ¶ 1's statutory purpose. Describing the "invention" "is part of the *quid pro quo* of a patent" (*Ariad Pharm.*, 598 F.3d at 1345): "the inventor's technical/scientific advance is added to the body of knowledge, as consideration for the grant of patent exclusivity." *Capon*, 418 F.3d at 1357. This "requirement serves both to satisfy the inventor's obligation to disclose the technologic knowledge upon which the patent is based, and to demonstrate that the patentee was in possession of the invention that is claimed." *Ibid.*; see also, *e.g.*, *Vas-Cath Inc.* v. *Mahurkar*, 935 F.2d 1555, 1561 (Fed. Cir. 1991) ("'Adequate description of the invention guards against the inventor's overreaching by insisting that he recount his invention in such detail that his future claims can be determined to be encompassed within his original creation.'") (citation omitted).

The provisionals fairly disclosed summation and explained in detail the innovations claimed in the '216 patent. There is no risk of overreaching. The inventor completed the difficult, novel work of developing the software-registration system; it would be untenable to deny the fruits of his labor for failing to include additional detail to a "generalized" construct that was marginally relevant to the invention—especially when the existing description already reflects a mechanism immediately obvious to any POSITA: as the Board and both experts acknowledged, the instruction to "combine" and "add" plainly sweeps in the obvious candidate of a summation algorithm. See *Capon*, 418 F.3d at 1358 (holding that the Board erred in demanding that the specification "reiterate" the details of "known DNA sequences"); cf. *In re Dossel*, 115 F.3d 942, 946 (Fed. Cir. 1997) (finding paragraph two satisfied even though "the written description does not disclose exactly what mathematical algorithm will be used to compute the end result").

B. 1. Notwithstanding this clear (and largely uncontroverted) showing, the Board still refused to find priority. Its conclusion rested on a fundamental misunderstanding of the governing standard: "the Australian provisional applications do not convey the *specific algorithm* disclosed in the sixth embodiment, namely, combination by addition, nor an *equivalent* * * * ." Appx20 (emphases added). Whether the specification disclosed a "specific" structure or its "equivalent," however, is the inquiry of *paragraph six*. See 35 U.S.C. 112, ¶ 6 ("such claim shall be

construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof"); *see also, e.g.*, *Biomedino, LLC* v. *Waters Tech. Corp.*, 490 F.3d 946, 952 (Fed. Cir. 2007) (explaining that paragraph six "requires some disclosure of structure in the specification corresponding to the claimed means" and that "[t]he inquiry is whether one of skill in the art would understand the specification itself to disclose a structure, not simply whether that person would be capable of implementing a structure"); *Atmel*, 198 F.3d at 1381-1382.

Paragraph 6 requires a precise disclosure because it embraces a "*quid pro quo*" of its own: It "permit[s] inventors to use a generic means expression for a claim limitation *provided that* the specification indicates what structure(s) constitute(s) the means." *Atmel*, 198 F.3d at 1381. "[P]articular structure" is necessary to "avoid pure functional claiming," and to put others on notice of the boundaries of the inventor's claimed rights. *Aristrocrat Tech. Australia Pty Ltd.* v. *Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). But there is no need for that level of granularity under paragraph one when it comes to describing basic concepts well-known to POSITAs. See *Atmel*, 198 F.3d at 1382. Details of known facts are immaterial to showing that the inventor possessed an invention "add[ing] to the body of knowledge." *Capon*, 418 F.3d at 1357. Indeed, under paragraph one's enablement analysis, the Court has advised that it is "preferabl[e]" for the patentee to

"*omit*[] what is well known in the art." *Hybritech Inc.* v. *Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed. Cir. 1986) (emphasis added). It would be bizarre for the enablement inquiry to encourage omission of basic details (like explaining specific ways to "add" and "combine") only for the written-description requirement to reject the patent for faithfully adhering to that advice.

Indeed, the Board's analysis cannot be squared with still other principles of patent law. It is hornbook law that a patent is not limited to the specific embodiments in the specification. Yet under the Board's logic, unless a specification explicitly discloses each embodiment, it flunks paragraph one's analysis. This would effectively require patentees to disclose every single species of every single genus listed in any specification, and to exhaustively detail all means of implementing general concepts, including those obvious to all POSITAs and marginally relevant to the core invention.

While it is true that patentees must still include specific structure to satisfy paragraph six, that requirement is found in—*paragraph six*. It is the means of cabining the *actual claims* that use functional terms. But it is not necessary for an inventor to "describe" the invention by listing every possible means of executing the "'generalized'" constructs adequately disclosed in the specification. Appx19-20. Here, for example, any POSITA would read the description and immediately understand how to "combine" the different items by "add[ing]" one to the other. That

22

is all *paragraph one* requires. The inventor did not have to say "summation" for POSITAs to know how to *use* summation as the primary (if not *exclusive*) candidate for the registration-number algorithm. And the inventor did not have to specifically say "summation" for POSITAs to understand that the inventor had indeed imagined the concept of adding numbers together.

In its only true effort to cast doubt on the obvious, the Board weakly resisted summation as a plausible option by saying that "user details" could be letters, and there was no disclosure how to add letters and numbers. Appx17. This flatly contradicts this Court's own ruling in *Microsoft*: this disclosure "*necessarily* incorporates an initial step of converting" letters to numbers (*Microsoft*, 632 F.3d at 1304-1305), a task that was rote and obvious to any POSITA at the time. See Appx18 (quoting *Microsoft* on this point—after ignoring it a page earlier). Just as the provisionals did not have to explain how to turn on a computer, they also did not have to explain to POSITAs how to carry out common, elementary programming tasks. When a POSITA sees that two items have to be added together, a POSITA automatically knows that each item must be converted to a common format—a num-

ber—before adding them together. And that task is necessarily presumed without explaining the obvious in the specification.[3]

2. The Board ultimately required a level of detail and exactitude precluded by this Court's precedents. Consistent with paragraph one's flexible test and purpose, the Court has repeatedly stressed that the specification need not "recite the claimed invention *in haec verba.*" *Ariad Pharm.*, 598 F.3d at 1352; see, *e.g.*, *Capon*, 418 F.3d at 1358 ("The 'written description' requirement states that the patentee must describe the invention; it does not state that every invention must be described in the same way."). On the contrary, the Court regularly approves claims that fail to precisely mimic the specification—including patents that claim both more narrowly and more broadly than the specification. See, *e.g.*, *Gentry Gallery, Inc.* v. *Berkline Corp.*, 134 F.3d 1473, 1480 (Fed. Cir. 1988) (noting "the uncon-

---

[3] Petitioners' expert made a similar mistake: "I mean, how do you combine or add something like a first name with a number? There's no algorithm provided. There's no description of a step-by-step procedure" Appx3423:10-12. The specification does not have to disclose a "step-by-step procedure" to satisfy Section 112, ¶ 1. There is simply no need to articulate actual code or the exact steps of known processes; flowcharts and prose are enough. See, *e.g.*, *Finisar Corp.* v. *DirecTV Group*, 523 F.3d 1323, 1340 (Fed. Cir. 2008). Dr. Madisetti misunderstands settled law in suggesting otherwise.

troversial proposition that 'a claim may be broader than the specific embodiment disclosed in a specification'") (citation omitted).[4]

A more restrictive test—like the one the Board erroneously employed—would also "'let form triumph over substance'" by "allow[ing] the written description requirement to eviscerate claims that are narrowed during prosecution, simply because the patent applicant broadly disclosed in the original patent application but then narrowed his claims during prosecution." *Union Oil*, 208 F.3d at 1000 (quoting *Application of Wertheim*, 541 F.2d 257, 263 (C.C.P.A. 1976)). That is tantamount to what happened here. Even accepting the Board's conclusions, the provisionals disclosed language that encompassed summation and non-summation algorithms, followed by Uniloc claiming only summation in the '216 patent. See *Wertheim*, 541 F.2d at 263 ("That what appellants claim as patentable to them is less than what they describe as their invention is not conclusive if their specifica-

---

[4] Remarkably, Dr. Madisetti would not even accept in haec verba support as satisfying the test. In response to the question "[i]f there were word-for-word text in the provisional that also show up in the non-provisional, you would agree that there is support for those particular words," he says "[n]o." Appx3408. That abject failure to comprehend the written-description requirement undermines the reliability of his opinion.

tion also reasonably describes that which they do claim."). That kind of narrowing maneuver has been expressly, and routinely, approved by this Court.[5]

For instance, *Tobinick* v. *Olmarker*, 753 F.3d 1220 (Fed. Cir. 2014), considered a challenge to a patent for a drug treatment for spinal injuries. The Board had decided that the application did not provide a written description for the claim because "it did not sufficiently delineate between local and non-local administration" of the drug. *Id.* at 1223; see *id.* at 1226 (noting the challenger's argument that the application "mixes local administration techniques with non-local techniques"). This Court reversed, explaining that the application "need only reasonably convey to one skilled in the art that [the patentee] had possession of *at least one* embodiment" of local administration. *Id.* at 1227. Again, the Board's decision cannot be squared with this precedent. Just as the *Tobinick* specification mixed local and non-local techniques, the provisionals (in the Board's view) mixed summation and non-

---

[5] The Board may have alluded to this concept when it stated that "[a] disclosure of a genus is not necessarily a disclosure of all of its species." Appx18 (citing *In re Baird*, 16 F.3d 380, 382 (Fed. Cir. 1994)). But the Board's citation of *Baird* only confirms its confusion. *Baird* examined obviousness under Section 103, not the written-description requirement under Section 112. See 16 F.3d at 382. Moreover, the generic formula disclosed there "encompass[ed] more than 100 million different diphenols, only one of which is" claimed in the challenged patent, and the choice of diphenol itself was the claimed invention. *Id.* at 382 & n.2, 382-83; cf. *Microsoft*, 632 F.3d at 1304-1305 (explaining that the summation structure is essentially immaterial to Uniloc's invention).

summation techniques. That over-disclosure and subsequent narrowing provides no basis for denying priority.[6]

4. In addition, the rule that the specification need not repeat the claim verbatim is even stronger where, as here, the purported discrepancy is immaterial to the invention as a whole. A hypothetical from this Court's predecessor court puts this point in sharp relief:

_____

[6] Cases abound implementing this principle. See, *e.g.*, *Capon*, 418 F.3d at 1358 (faulting the Board for holding that certain gene sequences "must be fully presented" to satisfy the written-description requirement because the "invention is not in discovering which DNA segments are related to the immune response, for that is in the prior art, but in the novel combination of the DNA segments to achieve a novel result"); *Lampi Corp.* v. *Am. Power Prods., Inc.*, 228 F.3d 1365, 1367-1368, 1378 (Fed. Cir. 2000) (where the earlier patent's specification of a plug-in light described "housing" for the light as comprising "identical half-shells" or simply "half-shells," noting that "identical half-shells are not critical to the invention," and rejecting an argument that those descriptions were "so narrowly tailored as to preclude [the patentee] from claiming *non-identical* half-shells in [his later] patent") (emphasis added); *Capon* v. *Eshar*, 418 F.3d 1349, 1358 (Fed. Cir. 2005) (faulting the Board for holding that certain gene sequences "must be fully presented" to satisfy the written-description requirement because the "invention is not in discovering which DNA segments are related to the immune response, for that is in the prior art, but in the novel combination of the DNA segments to achieve a novel result"); *In re Peters*, 723 F.2d 891, 893-894 (Fed. Cir. 1983) (reversing the Board for "confin[ing] [the patentee] to the specific embodiment disclosed in the original patent" because the omitted limitation was not "critical"—"[n]o prior art was distinguished from and no rejection was overcome on th[at] basis," and a POSITA "would readily understand that in practicing the invention it is unimportant"); *Application of Voss*, 557 F.2d 812, 817, 818 n.14 (C.C.P.A. 1977) (reversing the Board where the patent claimed a narrower range than the parent application, and noting that the application "indicate[s] no criticality in the percentage" range that was narrowed).

> If the original specification of a patent application on the scales of justice disclosed only a 1-pound "lead weight" as a counterbalance to determine the weight of a pound of flesh, we do not believe the applicant should be prevented, by the so-called "description requirement" of the first paragraph of § 112 * * * from later claiming the counterbalance as a "metal weight" or simply as a 1-pound "weight," although both "metal weight" and "weight" would indeed be progressively broader than "lead weight," including even such an undisclosed, but obviously art-recognized equivalent, "weight" as a pound of feathers. The broader claim language would be permitted because the description of the use and function of the lead weight as a scale counterbalance in the whole disclosure would immediately convey to any person skilled in the scale art the knowledge that the applicant invented a scale with a 1-pound counterbalance weight, regardless of its composition.

*In re Rasmussen*, 650 F.2d 1212, 1215 (C.C.P.A. 1981) (citation omitted) (emphases removed). So too here. The disclosure of information that is "combined" and "added" in this context "would immediately convey to any" POSITA that Uniloc invented a system for software registration, and summation was an option fitting comfortably within that system. The key is that the information combined by the algorithm produces a number relatively *unique* to the user. The actual algorithm itself is "unimportan[t]" to the invention (*Microsoft*, 632 F.3d at 1035), so long as it carries out the relevant function (*i.e.*, generating the unique licensee ID). Whatever daylight theoretically exists between "added" and "addition" makes no difference to Uniloc's significant contribution to the state of the art—as this Court itself confirmed in *Microsoft*. See *id.* at 1305 (the patent "repeatedly refers to the licensee unique ID generating means by the generic phrase, 'an algorithm,' and makes clear that the importance of the algorithm is only that it be 'adapted to generate a

registration number which is unique to an intending licensee'") (citations omitted)).[7]

5. Moreover, contrary to petitioners' view, this is far different from suggesting that a specification covers "obvious" *modifications* to the invention disclosed in the written description. Appx574 (quoting *Lockwood* v. *Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997)). It is one thing to say that a specification is limited to one body of work, but that POSITAs would understand that it could be applied broadly to other areas; the claims are still limited to the invention actually disclosed. It is quite another to say that a specification describes a *general* category encompassing obvious subcategories—including those eventually claimed—despite not including an encyclopedic list of *all* obvious iterations within that category. Patents are not limited to *explicit* embodiments; where, as here, a POSITA indisputably would read the so-called "generalized description" and instantly think summation as an obvious embodiment, paragraph one is satisfied: the provisionals described the invention as actually claimed, and it was not necessary (particularly

---

[7] Indeed, even though all agree that the provisionals' disclosures are also found in the '216 patent, no one suggests that the summation algorithm (in the sixth embodiment) is at odds with the earlier disclosures. The fact is that summation falls within those disclosures, and summation was an obvious technique for following the so-called "generic" instructions in the provisionals. That satisfies paragraph one, even if a specific structure was somehow not explicitly disclosed (under paragraph six).

under *paragraph one*) to explicitly list every conceivable structure falling within the broad construct described in the specification.

To be perfectly clear: no one genuinely maintains that POSITAs (*including the inventor*) would have been unfamiliar with summation algorithms. The point is that Uniloc disclosed the concept of the registration-number algorithm, described its inventive function, and outlined a general way to do it—"combining" information and "add[ing]" one number to another. The Board should not have asked whether that description *excludes* all non-summation algorithms, but whether it *encompasses* summation—so that any POSITA would immediately understand that Uniloc conceived of the invention. Here, given the plainness of the language, it is inconceivable that any POSITA would not immediately understand that Uniloc had indeed invented precisely the invention later disclosed in the '216 patent, including by using a summation algorithm to carry out the critical functions. For petitioners to prevail, they must show that a POSITA would have read this disclosure and not realized that Uniloc had conceived of the invention. Given that POSITAs would immediately realize that summation was the leading candidate for carrying out the

described functions, it is implausible that a POSITA would have doubted whether

Uniloc truly possessed the invention.[8]

C. Even if paragraph one did require in haec verba support for the '216 patent's claims, the Board's decision still lacks substantial evidence. As explained, the main difference in verbiage between the provisionals and the '216 patent is that the former use the word "added" whereas the latter uses the word "addition." The meaning of those words is identical and varies only based on sentence structure. A sentence from this Court's prior opinion on the '216 patent illustrates how the terms are essentially interchangeable: "This 'combination by *addition*' necessarily incorporates an initial step of converting the information into a common format to

---

[8] Even cases finding the written-description requirement unsatisfied impugn the Board's decision. In such cases, the specification either expressly precluded broadening or differed from the claim in a way that would cause a material, substantial change in the invention itself. See, *e.g.*, *Synthes USA, LLC* v. *Spinal Kinetics, Inc.*, 734 F.3d 1332, 1344 (Fed. Cir. 2013) (no adequate written description where the claim's narrowing would entail "significant biomechanical differences"); *PIN/NIP, Inc.* v. *Platte Chem. Co.*, 304 F.3d 1235, 1247 (Fed. Cir. 2002) (no adequate written description because the specification indicated that the invention embodied "a *mixture* of two chemicals" while the later claim covered "*separate* applications of the ingredients"); *Gentry Gallery*, 134 F.3d at 1479 (no written description where "the original disclosure clearly identifies the console as the *only possible* location for the controls" and that location was "an essential element of [the] invention") (emphasis added). Here, by contrast, there is no dispute that the disclosure at least included summation as an obvious option, and this Court has already held that the summation structure is not even important to the invention. *Microsoft*, 632 F.3d at 1305.

be *added*, which requires more than simple addition." 632 F.3d at 1304-1305 (emphases added).[9]

Nonetheless, the Board concluded that the Australian provisionals do not "teach[] combination by addition." Appx18. This is baseless. The only evidence the Board cites in support is conclusory testimony from petitioners' expert that "information can be combined in a non-math[e]matical manner." Appx19. But Dr. Madisetti's examples are nonsense in the context of the registration-number algorithm and the provisionals' use of the word "added." Dr. Madisetti testified, for example, that information can be combined by "mixing" or "scrambl[ing]" the data. Appx3419. That ignores the fact that the very same box in the figure of the provisionals that uses the term "added" also states that the information should be "re-arranged." Appx208; Appx227. If "added" could refer to "mixing" or "scrambling," the word "re-arranged" becomes redundant.[10]

---

[9] Ironically, Dr. Madisetti's testimony underscores the same point. When discussing the provisionals, he asks "how is this *addition* done" before attempting to correct himself to say "how is this added done [sic]." Appx3431.

[10] Dr. Madisetti's testimony is also self-contradictory. As Uniloc's expert explained, Dr. Madisetti's scrambling example is a series of concatenation operations, and Dr. Madisetti states when discussing the Schull patent that concatenation itself is a form of summation. Appx3240. If Dr. Madisetti is right about concatenation, it automatically follows that POSITAs would also know to convert user details to numbers (see *Microsoft*, 632 F.3d at 1304-1305), and then concatenate the

[Footnote continued on next page]

Moreover, neither Dr. Madisetti nor the Board explains why a POSITA would interpret "added" to convey "mixing" or "scrambling." This failure is unsurprising given that Dr. Madisetti's declaration overlooked the word "added" in the provisionals. His declaration states that the algorithm in the provisionals "is not described in any detail other than to say that pieces of information are 'combined.'" Appx784. But that ignores Figure 2B and its express description of the relevant algorithm. "Added" is a critical term because it describes *how* numbers are combined, and it subsumes the "addition" contemplated in the '216 patent.[11]

Other examples from Dr. Madisetti's ad hoc testimony fare no better. As the Board recounts, he "testified that the word 'add' does not necessarily mean 'sum' because it can also describe 'adding a redundancy' and 'add[ing] a header.'" Appx19; see Appx3427. But those examples have nothing to do with the licensee

---

[Footnote continued from previous page]
numbers using summation. Under his own logic, the provisionals disclose a summation algorithm.

[11] Indeed, Dr. Madisetti testified that he reviewed each application in its entirety including the critical figures ("2B") in each application. But this is impossible to square with what Dr. Madisetti actually wrote. He said, unmistakably, that there is "*only*" a "vague reference to a 'registration number algorithm,' which is not described in any detail other than to say that pieces of information are 'combined.'" Appx784 (emphasis added). Nowhere in his report did he confront or acknowledge the flowchart in the provisionals or give any sense what it could possibly mean. He either overlooked the figure or failed to understand its obvious import. Either way, he manifestly erred in saying that the paragraph was the "only" relevant section, and the Board erred in excusing this obvious mistake.

ID generating means. Words often mean different things in different contexts, but neither the Board nor Dr. Madisetti explained how those meanings even plausibly fit in this context. Dr. Madisetti's mere say-so cannot overcome the obvious identity between "added" and "addition" when combining data in a *number algorithm*.

In sum, as Uniloc's expert explained, any POSITA (and, indeed, any ordinary person) would understand "added" to mean "addition," and no plausible evidence suggests otherwise. Dr. Madisetti's unsupported—and unsupportable—efforts to distinguish "added" and "addition" are entitled to no weight. His declaration did not even address the term "added," and that neglect explains his fantastical attempts to rehabilitate his opinion on the fly in his deposition. The Board cannot rely on the conclusory say-so of an expert: "an expert's opinion on the ultimate legal issue must be supported by something more than a conclusory statement." *In re Buchner*, 929 F.3d 660, 661 (Fed. Cir. 1991); see also, *e.g.*, *SkinMedica, Inc.* v. *Histogen Inc.*, 727 F.3d 1187, 1210 (Fed. Cir. 2013) (expert's opinion "deserves no weight" because it was "conclusory and incomplete" and "appear[ed] to conflict with the plain language of the written description"); *Upjohn Co.* v. *Mova Pharm. Corp.*, 225 F.3d 1306, 1311 (Fed. Cir. 2000) ("At this critical point in the determination of obviousness, there must be factual support for an expert's conclusory opinion.").

The Board's decision is legally wrong and lacks substantial evidence; it should be reversed.

### 2. The Australian provisionals adequately described the "mode switching means"

The Board also determined that the Australian provisionals failed to provide the required structure for "mode-switching means" (Appx20-23), but that is obviously wrong. According to the Board, the provisionals lacked structure because they did not include the words "program code" in describing *software programming*. Appx22. Its decision is legally and factually baseless, and it warrants reversal.

The structural disclosure for "mode switching means" is "program code which performs a comparison of two numbers or a comparator and equivalents thereof." Appx101(6:12-14); see Appx20. The Board agreed that the provisionals disclosed "the function of the mode switching means," but concluded they did not disclose "the structure, namely, program code or its equivalent, or the hardware, a comparator." Appx22.

The Board is deeply confused. Again, under paragraph one's operative inquiry, there was no need to explicitly disclose "program code"—it was enough to convey (as the provisionals plainly did) that the inventor conceived of an invention that encompassed "program code" to compare the registration numbers. Indeed, the provisionals describe using an "Application" to compare registration numbers;

35

those numbers are entered "*into the user PC * * * <u>where</u>* the *security routine* checks" for a "match[]."Appx202-203 (emphasis added). The result dictates whether "access is provided by the security routine" or whether "a dialogue box D appears on the display 13 of user PC 12." Appx203. This text makes emphatically clear that this entire operation occurs inside the computer, where the numbers were "entered," "where" the security routine was run, and where the results are automatically activated. That establishes beyond any doubt that "program code" or a "comparator" performs these tasks—the Board never even suggested a conceivable alternative, because none exists.

Moreover, the Board's reasoning again fails on its own terms. Notably, the Board agreed with Uniloc's key factual assertions. It accepted "[t]he fact that the security routine [in the provisionals], which provides the function, is 'attachable to software' *and that software is 'often used interchangeably' with program code*." Appx22 (Uniloc's briefing) (emphasis added); see Appx3243 (Uniloc's expert explaining these facts). Yet in the same sentence that it acknowledged that "fact," it also declared that a POSITA would not have "clearly concluded from the Australian provisionals that program code, or an equivalent, is the structure that performs the mode switching means function." *Ibid.* But the Board never explains why, if the "security routine" is attached to the software and "software" equates with "program code," the disclosure of the security routine does not adequately describe

36

"program code." Indeed, it is a mystery how an algorithm-based routine "attached" to "software" that resides in the "user PC" could be anything *but* program code. Appx198-199, 202-203 ("The user 11 enters the registration number *into the user PC* 12 *where* the security routine checks to see whether the entered registration number matches the calculated registration number.") (emphasis added); cf. *In re Dossel*, 115 F.3d 942, 946-947 (Fed. Cir. 1997) (addressing paragraph two and concluding that, even though the patent did not "use[] the magic word 'computer,'" "a unit which receives digital data, performs complex mathematical computations and outputs the results to a display must be implemented by or on a general or special purpose computer").[12]

The Board does not cite a shred of record evidence to support its decision, and none exists. The entirety of Dr. Madisetti's declaration consists of a lone sentence: "The [Australian applications] similarly do not disclose any structure for the 'mode switching means' claim limitations in the '216 Patent, such as through an algorithm for performing a comparison (software) or a comparator (hardware)."

---

[12] If the Board meant to fault the provisionals for not explicitly listing the lines of program code, cf. Appx3398 (Dr. Madisetti complaining that "it's a duty to explicitly disclose, either explicitly or inherently, the structure, whether it's code on a processor or it's hardware"), that complaint would once more reflect its miscomprehension of the appropriate legal standard. There is no obligation to describe the actual code in order to disclose relevant structure. See, *e.g.*, *Typhoon Touch Techs., Inc.* v. *Dell, Inc.*, 659 F.3d 1376, 1385 (Fed. Cir. 2011).

Appx784-785; see also Appx3397 ("I have not found any algorithm or structure or hardware."). That unsubstantiated assertion fails as a matter of law, which is why the Board could not rely on it. Cf. *Rambus Inc.* v. *Rea*, 527 F. App'x 902, 908 (Fed. Cir. 2013) ("This court has made clear that '[b]road conclusory statements standing alone are not evidence.'") (quoting *In re Kotzab*, 217 F.3d 1365, 1370 (Fed. Cir. 2000)).

At bottom, the Board held that the written description—disclosing a security routine ("Application") attached to software, operating within a computer, somehow could exist without "program code." That perplexing conclusion is unexplained (because it is inexplicable), and it requires reversal. See, *e.g.*, *Power Integrations, Inc.* v. *Lee*, 797 F.3d 1318, 1323 (Fed. Cir. 2015) ("Under the APA, the board is obligated not only to come to a sound decision, but to fully and particularly set out the bases upon which it reached that decision."); *Arendi S.A.R.L.* v. *Apple Inc.*, No. 2015-2073, 2016 WL 4205964, at *9 (Aug. 10, 2016) (reversing the Board's decision as "conclusory and unsupported by substantial evidence"); *Cutsforth, Inc.* v. *MotivePower, Inc.*, 636 F. App'x 575, 577 (Fed. Cir. 2016) ("Broad, conclusory statements are not enough to satisfy the Board's obligation to provide reasoned explanation for its decision.").

### C.    Reversal is proper without any further remand

Although courts typically remand when the agency makes a legal error, immediate disposition is appropriate if remand "would be futile" because "only one disposition is possible as a matter of law." *George Hyman Const. Co.* v. *Brooks*, 963 F.2d 1532, 1539 (D.C. Cir. 1991). Accordingly, this Court regularly reverses the Board without remand when the record permits only one result. See, *e.g.*, *Arendi*, 2016 WL 4205964, at *9 (reversing because "a more reasoned explanation than that provided by the Board can[not] be gleaned from the record"); *Smith & Nephew, Inc.* v. *Rea*, 721 F.3d 1371, 1380 (Fed. Cir. 2013) (reversing where the Board's decision "was mainly the result of [] analytical errors"); *In re Baker Hughes Inc.*, 215 F.3d 1297, 1303-1304 (Fed. Cir. 2000) (reversing without remanding for an obviousness determination where "[t]he differences between the processes are readily apparent").

That is the correct result here. As discussed, under the proper test, there is substantial evidence only for a conclusion that Uniloc is entitled to the priority date of the Australian provisionals. The undisputed evidence and the Board's own findings show that the provisionals encompassed summation and that they disclosed a security routine that included (unremarkably) program code; the Board simply misunderstood that this was sufficient as a matter of law.

Uniloc is entitled to claim priority to the Australian provisionals, and the Board's contrary conclusion should be reversed.

## II. THE BOARD'S DETERMINATION THAT THE PATENT'S CLAIMS ARE ANTICIPATED OR OBVIOUS IN LIGHT OF SCHULL IS LEGALLY AND FACTUALLY UNAVAILING

The Board found that claims 1-11 and 17-20 of the '216 patent were invalid as anticipated or obvious under Schull. This was plain error on multiple levels.

"Anticipation requires that all of the claim elements and their limitations are shown in a single prior art reference." *In re Skvorecz*, 580 F.3d 1262, 1266 (Fed. Cir. 2009); see *In re Rambus, Inc.*, 753 F.3d 1253, 1256 (Fed. Cir. 2014) ("A patent is anticipated 'if a single prior art reference discloses each and every limitation of the claimed invention.'") (citation omitted). There must be a perfect "identity" between "the claimed process" and the "prior art"; each limitation must be disclosed "expressly or inherently" in a single reference. *Glaverbel Societe Anonyme* v. *Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1554 (Fed. Cir. 1995). While the anticipation inquiry is a factual one, "[i]f any claimed element or limitation is" absent from the reference, anticipation fails "as a matter of law." *Skvorecz*, 580 F.3d at 1266-67 (reversing the Board); see *Rowe* v. *Dror*, 112 F.3d 473, 481 (Fed. Cir. 1997) (reversing the Board because, "[a]lthough anticipation is a question of fact, this court can conclude from this record that the Lemelson patent does not antici-

pate Rowe's properly interpreted claim") (citation omitted); *Rambus*, 753 F.3d at 1258 (reversing the Board's anticipation decision for lack of substantial evidence).

The Board's decision cannot withstand these settled principles.

## A. Schull Is Not Prior Art

The Board's decision fails, first and foremost, because Schull is not prior art. As explained in Part I, the correct priority date of the '216 patent is September 21, 1992, and the Schull reference was filed on December 15, 1992 (Appx113). That is dispositive of petitioners' challenge: because Schull is not prior art, it cannot anticipate or render obvious any claims in Uniloc's patent.

## B. Schull Fails To Teach "Generating Means" Because It Does Not Disclose A Summation Algorithm

Even if Schull is prior art, it still fails to teach each element of the '216 patent. As explained above, the '216 patent ultimately disclosed the structure of a summation algorithm, summer, or its equivalent for the licensee unique ID generating means. The Board concluded that Schull's "Passwordable ID" also disclosed a summation algorithm (Appx26-33), but the Board was wrong. There is not a single express reference to addition in Shull. The Board declared that Schull inherently disclosed addition, but it directly misstated the record evidence and failed to address material arguments. Its decision should be reversed.

### 1. Schull expressly relies on concatenation to generate a Passwordable ID, and summation is not explicitly or inherently disclosed in concatenation

a. According to the Board and Dr. Madisetti, Shull discloses a summation algorithm because it "prominently uses addition to perform the function of generating an ID." Appx26. This is perplexing. Addition is not "prominent" in any part of Schull. In plain terms, Schull describes a process of "combin[ing]" three ID numbers using *concatenation*—the act of linking together disparate items in a manner that "preserves their uniqueness." Schull specifically references "concatenat[ion]" (Appx 119(7:16-26)), not summation. And as Uniloc's expert explained, POSITAs understand that "concatenation" is not implemented with a "summation algorithm," and thus Schull does not disclose any "addition" in generating its Passwordable ID. Appx3248.

In order to counter this problem, Dr. Madisetti suggested that there were "two basic approaches" for performing concatenation: "(1) multiplying the first integer and second integer by a power of ten (dependent on the number of digits of the subsequent numbers) and adding the three integers together, or (2) converting the integers to 'strings,' concatenating the strings, and converting the result back to an integer." Appx792. As Dr. Madisetti conceded, "[e]ach of these programmatic approaches will provide the same result." *Ibid.*

42

But therein lies the problem: each "approach" produces the same result, *and only the first option involves summation.* Dr. Madisetti attempted to sidestep this problem by suggesting the first method was faster and more efficient (Appx792-793), but that is hardly adequate to satisfy petitioners' burden. In order to show that summation is *inherent* in Shull, petitioners must show that its disclosed algorithm can *only* be performed using summation. If there is any alternate construction that does not use summation, an inherency argument fails. See, *e.g.*, *Schreiber*, 128 F.3d at 1477.[13]

In addressing this fatal flaw, the Board said—nothing. Indeed, the Board did not even appreciate that Dr. Madisetti himself conceded there was a clear, independent method of performing Schull's steps without using addition. In addressing these issues, the Board accepted Dr. Madisetti's claim that the first method involved addition, and then it criticized Dr. DiEuliis's independent method (a "third approach," Appx2078) for concatenating the numbers without addition. Appx28-30. But between the two experts, there were *three* separate methods—only two

---

[13] Indeed, nowhere did Dr. Madisetti even substantiate his claim that POSITAs would have been aware of the purported efficiencies and advantages of the "summation" option. Even if that option truly were better—which was subject to a battle of the experts below—the showing is meaningless unless *all* POSITAs would have been so convinced of the advantages that no one would conceivably concatenate numbers using the "string" approach. There is no such evidence anywhere in the record satisfying that heavy burden.

possibly involving addition—and the Board *never addressed the third*. The Board nowhere explained why POSITAs would not have used Dr. Madisetti's second option, where strings are linked together and converted (without summation) into a long integer. This approach was directly grounded in record evidence, and it was undisputed that a POSITA could have used it to carry out Schull's concatenation. The Board could not find addition "inherent" in Schull without definitively excluding this option as an alternative—a difficult task given that Dr. Madisetti himself introduced the option and admitted it would perform the function.

This error is particularly ironic in light of the backdrop. Dr. Madisetti invented a complex, convoluted way to accomplish a simple task (concatenation) by using addition and multiplication. Yet both the Board and Dr. Madisetti firmly resisted reading the Australian provisionals to mean what they plainly said—instead suggesting that "add[ing]" items together did *not* involve addition, while linking items together somehow *did* involve addition. The Board's disparate treatment fails as a matter of law.

b. The Board's logic fails for another reason: it is hardly clear that Dr. Madisetti's first option is "fairly capable of categorization as 'a summation algorithm.'" *Microsoft*, 632 F.3d at 1305. The entire point and result of concatenation is to link together three numbers, not add them together. Indeed, Schull itself stresses that the process should "preserve[] the[] uniqueness" of the numbers. Appx 119(7:24).

44

Almost any basic formula could be deconstructed in a manner that permits the injection of addition or multiplication through the backdoor. But it is hardly obvious that an algorithm characterized as "concatenation" on its face is "fairly" considered a summation algorithm for purposes of the '216 patent.

c. Finally, the Board improperly rejected Dr. DiEuliis's third method for concatenating numbers—storing the separate numbers in contiguous places in memory. See Appx532-534 (discussing this method and the supporting evidence). His method was supported directly by common parlance (via dictionaries) and common practice (via years of experience). While the Board asserted that his method would not produce a "long integer" (which is expressly called for by Schull), the Board never explained why Dr. DiEuliis's method could not *produce the output as an integer*. See Appx29-30. The Board's limited discussion of this viable alternative was inadequate, and it should be reversed.

### 2. Schull's limited use of a checksum does not explicitly or inherently disclose a summation algorithm

According to the Board, even if concatenation did not involve addition, "Schull's disclosure of appending two additional digits to the concatenated number using a checksum does." Appx30. In so holding, the Board accepted petitioners' argument that checksums virtually always involve summation. The Board's analysis was inadequate as a matter of law.

45

First, the Board refused to address one of Uniloc's primary objections to this theory: the fact that the checksum is *appended* to the Passwordable ID does not mean that it *becomes* part of the ID. (Indeed, the fact that it is *only* appended suggests that it does not become part of the ID.[14]) See Appx537-538. And since only the ID itself is used in carrying out the relevant functions, it makes no difference how the checksum is computed: if the structure does not perform the function, Schull cannot anticipate.

The Board simply had no answer for this challenge. But an agency cannot invalidate a patent by accepting a petitioner's argument without addressing the preserved counterarguments of the opposing party. This was error as a matter of law, and it again requires reversal. See, *e.g.*, *Power Integrations, Inc.* v. *Lee*, 797 F.3d 1318, 1323 (Fed. Cir. 2015) ("Under the APA, the board is obligated not only to come to a sound decision, but to fully and particularly set out the bases upon which it reached that decision."); *Arendi S.A.R.L.* v. *Apple Inc.*, No. 2015-2073, 2016 WL 4205964, at *9 (Aug. 10, 2016) (reversing the Board's decision as "conclusory and

---

[14] If Schull is read to include extra information as part of the ID itself, it directly disproves petitioners' entire theory: in the very next paragraph, Schull explains that the ID could "also" encrypt "the name of the party who should receive royalties." Appx119(7:40-42). But if the ID is using *names*, then (under petitioners' logic) it could not be manipulated as a *number*. Petitioners cannot have it both ways: if names or numbers are each capable of use in summation algorithms, then the Australian provisionals are also capable of "adding" user details using addition.

unsupported by substantial evidence"); *Cutsforth, Inc.* v. *MotivePower, Inc.*, 636 F. App'x 575, 577 (Fed. Cir. 2016 ("Broad, conclusory statements are not enough to satisfy the Board's obligation to provide reasoned explanation for its decision.").

Second, Dr. DiEuliis specifically referenced three separate methods of using a table to perform a checksum. Appx538. While Dr. Madisetti suggested that certain tables themselves were constructed using addition, that is hardly sufficient: a table constructed using summation does not make the algorithm *using that table* a summation algorithm. Contra Appx30-31.

It is undisputed that Schull did not *expressly* disclose a summation algorithm, and the record unequivocally establishes that Schull did not *inherently* disclose summation in any of its functions. The Board erred in relying on Schull, and its decision should be reversed.

## III.  THESE AGENCY PROCEEDINGS ARE INFECTED WITH CONSTITUTIONAL AND ADMINISTRATIVE-LAW ERRORS

### A. The Board's Inter Partes Review—Especially As Applied To An *Expired* Patent—Is Unconstitutional Under Article III And The Seventh Amendment

These IPR proceedings are unconstitutional under Article III and the Seventh Amendment, and the judgment below accordingly should be vacated. Under inter partes review, third parties are permitted to litigate the validity of granted patents before Article I judges, even where, as here, the patent has since expired. This

effectively permits Article I judges to adjudicate purely private disputes that no longer implicate any public rights. Expired patents have no prospective force; the only live controversy involves infringement litigation over past conduct between private actors.

Congress's decision to vest judicial power outside the judicial branch violates Article III, and its decision to permit agencies to extinguish vested property rights without a jury trial violates the Seventh Amendment. See, *e.g.*, *Stern* v. *Marshall*, 564 U.S. 462, 484 (2011) (explaining the unconstitutionality of permitting state-law counterclaims to be tried in non-Article III bankruptcy proceedings); *Granfinanciera, S.A.* v. *Nordberg*, 492 U.S. 33, 41-42 (1989). Unlike cases involving live patents, an IPR proceeding over an expired patent is only relevant due to the effects it can have in private infringement litigation. That distinguishes this setting from other situations where this Court (post-*Stern*) has rejected similar Article III and Seventh Amendment challenges. See, *e.g.*, *MCM Portfolio LLC* v. *Hewlett-Packard Co.*, 812 F.3d 1284 (Fed. Cir. 2015); see also, *e.g.*, *Joy Techs.* v. *Manbeck*, 959 F.2d 226 (Fed. Cir. 1992).

While Uniloc acknowledges that the panel may nevertheless feel bound by existing circuit law, it respectfully submits that this distinguishing factor (the material difference of an expired patent) leaves this question open for consideration. Either way, however, Uniloc presses this issue now to preserve it for further review.

## B. These Proceedings Are Invalid In Light Of The Director's Unlawful Delegation Of The Institution Function To The Board

These proceedings are invalid at the outset, in light of the Director's unlawful delegation of the institution function to the Board, and the Board's improper exercise of that function contrary to the Patent Act. The Patent Act speaks in plain terms: "[t]he Director" of the USPTO—not the PTAB—"shall determine whether to institute an inter partes review under this chapter" (35 U.S.C. 314(b)), and the PTAB "shall * * * conduct each inter partes review instituted under this chapter" (35 U.S.C. 316(c)). The Director violated this clear statutory command in delegating her institution authority to the Board (37 C.F.R. 42.4(a)), combining distinct statutory functions that are bifurcated by design.

The PTAB instituted proceedings under that unlawful regulation, and the proceedings accordingly are invalid as a result. While Uniloc acknowledges that binding circuit precedent has rejected this argument (*Ethicon Endo-Surgery, Inc.* v. *Covidien LP*, 812 F.3d 1023 (Fed. Cir. 2016)), Uniloc again respectfully preserves the issue here for further review.

## CONCLUSION

The Board's judgment should be reversed and the case should be remanded with instructions to confirm the patentability of claims 1-11 and 17-20; in the alternative, the Board's judgment should be reversed and the case should be remanded with instructions to dismiss in light of the invalidity of the proceedings.

Respectfully submitted.

/s/ *Daniel L. Geyser*

Daniel L. Geyser
 *Principal Attorney*
Douglas D. Geyser
725 S. Figueroa Street, Suite 1830
Los Angeles, CA  90017
Tel.:  (213) 995-6811
Fax:  (213) 261-0299
*daniel.geyser@strismaher.com*
*douglas.geyser@strismaher.com*

*Counsel for Appellants Uniloc USA, Inc.*
*and Uniloc Luxembourg S.A.*

October 13, 2016

# ADDENDUM

Trials@uspto.gov                            Paper 27
571-272-7822                            Entered: March 10, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

SEGA OF AMERICA, INC., UBISOFT, INC., KOFAX, INC.,
CAMBIUM LEARNING GROUP, INC., and
PERFECT WORLD ENTERTAINMENT, INC.,
Petitioner,

v.

UNILOC USA, INC. and UNILOC LUXEMBOURG S.A.,
Patent Owner.
_____

Case IPR2014-01453[1]
Patent 5,490,216 C2

Before WILLIAM V. SAINDON, DONNA M. PRAISS, and
PATRICK R. SCANLON, *Administrative Patent Judges.*

PRAISS, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

---

[1] Case IPR2015-01026 has been joined with this proceeding.

IPR2014-01453
Patent 5,490,216 C2

# I.    BACKGROUND

## A.    Introduction

SEGA of America, Inc., Ubisoft, Inc., Kofax, Inc., and Cambium Learning Group, Inc. (collectively, "Petitioner") filed a Petition (Paper 6, "Pet.") to institute an *inter partes* review of claims 1–20 of U.S. Patent No. 5,490,216 ("the '216 patent"). Uniloc USA, Inc. and Uniloc Luxembourg S.A. (collectively, "Patent Owner") timely filed a Preliminary Response (Paper 10, "Prelim. Resp."). Taking into account the arguments presented in Patent Owner's Preliminary Response, we determined that the information presented in the Petition establishes a reasonable likelihood that Petitioner would prevail in challenging claims 1–20 of the '216 patent under 35 U.S.C. §§ 102(b) and 103(a). Pursuant to 35 U.S.C. § 314, we instituted this proceeding on March 10, 2015, as to these claims of the '216 patent. Paper 11 ("Dec. on Inst.").

During the course of trial, we joined case no. IPR2015-01206, and Perfect World Entertainment Inc. as a Petitioner, to this proceeding. Paper 16. Patent Owner timely filed a Patent Owner Response (Paper 14, "PO Resp."), and Petitioner timely filed a Reply to the Patent Owner Response (Paper 19, "Pet. Reply"). An oral hearing was held on December 2, 2015, and a transcript of the hearing is included in the record. Paper 26 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6(c). This decision is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of claims 1–20 of the '216 patent. For the reasons discussed below, we determine that Petitioner has demonstrated by a preponderance of the evidence that these claims are unpatentable under §§ 102(e) and 103(a).

2

IPR2014-01453
Patent 5,490,216 C2

## B.    Related Matters

The parties indicate that the '216 patent was asserted in complaints
filed in the U.S. District Court for the Eastern District of Texas against
SEGA of America, Inc. (No. 6:13-cv-627), Ubisoft, Inc. (No. 6:13-cv-628),
Cambium Learning, Inc. (No. 6:14-cv-419), Kofax, Inc. (No. 6:14-cv-427),
and Perfect World Entertainment, Inc. (No. 6:14-cv-429).  Pet. 54; Paper 9.
Additional litigations in which the '216 patent has been asserted are listed in
Ex. 1031.  The '216 patent is also the subject of IPR2015-01207, which was
instituted on December 2, 2015, and petitions filed in IPR2016-00414 and
IPR2016-00427.

The '216 patent was the subject of *Uniloc USA, Inc. v. Microsoft
Corp.*, No. 03-0440 (D.R.I.) in which a decision on claim construction was
issued (Ex. 1008) and affirmed by the Federal Circuit (Ex. 1009; Ex. 1010).
PO Resp. 4; Pet. 3.  The '216 patent was also the subject of two
reexamination proceedings (Control Nos. 90/010831 and 90/012179).  PO
Resp. 4; Pet. 12–15.  Additionally, the '216 patent was the subject of
petitions for covered business method review (CBM2014-00183) and for
*inter partes* review (IPR2015-00178), which were denied.  PO Resp. 5 n.2;
Pet. 55.

## C.    The '216 Patent (Ex. 1001)

The '216 patent, titled "System for Software Registration," is directed
to a system that allows software to run without restrictions ("use mode") if a
specified licensing procedure has taken place.  Ex. 1001, Abstr.  A code
portion in the digital data to be protected may include an algorithm that
generates a registration number unique to a licensee of the digital data.  *Id.*
The algorithm in the code portion is duplicated at a remote location under

3

IPR2014-01453
Patent 5,490,216 C2

the control of the licensor. *Id*. A mode switching means compares the local and remote registration numbers and, if they match, the program enters into a use mode. *Id*. at 4:49–54, 13:37–40. If they do not match, the program enters into a "demo mode" in which features of the program are disabled. *Id*.

    The block diagram of Figure 8 of the '216 patent is reproduced below to illustrate the registration system:



FIG. 8

4

IPR2014-01453
Patent 5,490,216 C2

The registration system depicted in Figure 8 operates in the manner generally described by the embodiments disclosed in the '216 patent. *Id*. at 11:43–45.

### D.    Illustrative Claims

Independent claims 1 and 12 are illustrative of the claims at issue (paragraphing, indentations, and bracketed matter added):

>1.  A registration system for licensing execution of digital data in a use mode, said digital data executable on a platform, said system including
>
>[a] local licensee unique ID generating means and remote licensee unique ID generating means,
>
>[b] said system further including mode switching means operable on said platform which permits use of said digital data in said use mode on said platform only if a licensee unique ID first generated by said local licensee unique ID generating means has matched a licensee unique ID subsequently generated by said remote licensee unique ID generating means; and
>
>[c] wherein said remote licensee unique ID generating means comprises software executed on a platform which includes the [sic] algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID.
>
>12.  A registration system attachable to software to be protected,
>
>[a] said registration system generating a security key from information input to said software which uniquely identifies an intended registered user of said software on a computer on which said software is to be installed; and
>
>[b] wherein said registration system is replicated at a registration authority and used for the purposes of checking by the registration authority that the information unique to the user is correctly entered at the time that the security key is generated by the registration system.

5

IPR2014-01453
Patent 5,490,216 C2

### E.    Prior Art Relied Upon

Petitioner relies on the following prior art:

| Reference | Publication | Date | Exhibit |
|---|---|---|---|
| Haines | US 5,077,660 | Dec. 31, 1991 | 1005 |
| Logan | US 5,199,066 | Mar. 30, 1993 | 1003 |
| Grundy | US 5,291,598 | Mar. 1, 1994 | 1004 |
| Schull | US 5,509,070 | Apr. 16, 1996 | 1002 |
| Manduley | US 5,956,505 | Sept. 21, 1999 | 1006 |

Petitioner also relies on the Declaration of Vijay K. Madisetti dated
September 5, 2014 ("Madisetti Decl." Ex. 1007).

### F.    Instituted Grounds of Unpatentability

We instituted this proceeding based on the asserted grounds of
unpatentability ("grounds") set forth in the table below.  Dec. on Inst. 23.

| Claims Challenged | Basis | Reference(s) |
|---|---|---|
| 1–11, 17–20 | § 102(e) | Schull |
| 10, 11 | § 103(a) | Schull |
| 12–14 | § 102(e) | Logan |
| 15, 16 | § 103(a) | Logan and Grundy |
| 12–14 | § 103(a) | Haines and Manduley |

## II.    ANALYSIS

### A.    Claim Interpretation

As a first step in our analysis, we determine the meaning of the
claims.  Because the challenged patent expired on September 21, 2013 and,
as such, the claims are not subject to amendment, the rule of "broadest
reasonable construction" per 37 C.F.R. § 42.100(b) does not apply.  In this
circumstance, the Board's review of the claims is similar to that of a district
court.  *In re Rambus Inc.*, 694 F.3d 42, 46 (Fed. Cir. 2012).  Specifically, the
claim terms are given their ordinary and customary meaning, as would be
understood by a person of ordinary skill in the art, at the time of the

6

IPR2014-01453
Patent 5,490,216 C2

invention, in light of the language of the claims, the specification, and the prosecution history of record.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313–17 (Fed. Cir. 2005) (en banc).

Petitioner proposes that we adopt the claim construction of the District Court for the District of Rhode Island issued in *Uniloc USA, Inc. v. Microsoft Corp.*, No. 03-CV0440 ("Microsoft litigation") for purposes of the Petition "except where noted".  Pet. 3; *see* Ex. 1008 (claim construction decision and order dated Aug. 22, 2006); Ex. 1011, 27–28 (summary judgment decision clarifying claim construction dated Oct. 19, 2007).  Petitioner asserts that the term "checking by the registration authority that the information unique to the user is correctly entered," as recited in claim 12, lacks written description support.  Pet. 6.  Petitioner also asserts that there is no structure disclosed in the '216 patent to support the term "platform unique ID generating means," as recited in claims 7–9.  *Id*. at 9.  Nevertheless, Petitioner provides the District Court construction for these terms for the purpose of its unpatentability analysis.

Patent Owner does not propose alternative constructions to the District Court claim constructions, but contends that the Petition "reconstructs" the claim term "security key" and disputes Petitioner's argument that certain claim terms lack definiteness or support in the specification for the required structure.  PO Resp. 9–12.  Regarding the term "security key," Patent Owner acknowledges that the District Court stated "vendor information *may indeed be an input* to creating the licensee unique ID", but asserts that the District Court "did not hold that the product number *alone* provides 'a unique identifier associated with a licensee.'"  *Id*. at 9–10 (quoting Ex. 1008, 12).  Patent Owner further contends that the claim

7

IPR2014-01453
Patent 5,490,216 C2

construction of "security key" was not modified by the Federal Circuit, which stated that "a user intending to use the software in 'use mode' enters certain user information when prompted, which *may include* a software serial number and/or name and address information." *Id*. at 10 (quoting Ex. 1010, 3). Patent Owner notes that the Federal Circuit decision held that the District Court's construction of security key is correct "as a unique identifier associated with a licensee that can be, but is not limited to, personally identifiable information about the licensee or user" and that "the licensee unique ID *could encompass* vendor-supplied information." *Id*. at 11 (quoting Ex. 1009, 13).

In the Decision to Institute, we agreed with the analysis by the District Court for the District of Rhode Island and adopted the claim construction issued in the Microsoft litigation. Dec. on Inst. 7; *see* Ex. 1008; Ex. 1011, 27–28. Given the parties' acceptance of our constructions of each claim phrase in the Decision to Institute, we discern no reason to alter those constructions for the purpose of this Final Written Decision. For convenience, those constructions are reproduced in the table below.

| Claim Term | Claim Construction |
| --- | --- |
| Licensee Unique ID (claims 1, 19, 20) Security Key (claims 12, 13) Enabling Key (claim 17) | A unique identifier associated with a licensee |
| Information uniquely descriptive of an intending licensee (claim 2) Information . . . which uniquely identifies an intended registered user (claim 12) | Information that is uniquely associated with a person who intends to become a licensee so as to access full functionality of the digital data |
| Algorithm (claims 1, 13, 14, 19, 20) | A set of instructions that can be followed to carry out a particular task |

8

IPR2014-01453
Patent 5,490,216 C2

| Claim Term | Claim Construction |
|---|---|
| Includes the algorithm utilized by said local licensee unique ID generating means to produce said licensee unique ID (claims 1, 19, 20) | Includes the identical algorithm used by the local licensee unique ID generating means to produce the licensee unique ID |
| Generated by a third party means of operation of a duplicate copy of said registration key generating means (claim 17) | Generated by a third party's use of a duplicate copy of the registration key generating means |
| Use mode (claims 1, 7, 19, 20) Fully enabled mode (claim 17) Full version run (claim 15) | A mode/version that allows full use of the digital data or software in accordance with the license |
| Partly enabled or demonstration mode (claim 17) Demonstration mode (claim 15) | A mode that allows partial use of the digital data or software |
| Has matched (claims 1, 17, 19, 20) | A comparison between the locally generated licensee unique ID/registration key and the remotely generated licensee unique ID/enabling key shows that the two are the same |
| Mode switching means will permit said data to run in said use mode in subsequent execution . . . only if said platform unique ID has not changed (claim 7) | The mode switching means will permit the data to run in the use mode only if the platform unique ID is identical to what it was the previous time the digital data were run |
| Registration system (claims 1, 12, 19, 20) | A system that allows digital data or software to run in a use mode on a platform if and only if an appropriate licensing procedure has been followed |
| Provided to said mode-switching means by said intending user (claim 17) | Provided to the mode-switching means by the person who intends to become a licensee |
| Communicated to said intending user (claim 17) | Communicated to the person who intends to become a licensee |
| Checking by the registration authority that the information | Verification by the registration authority that information unique to the |

9

IPR2014-01453
Patent 5,490,216 C2

| Claim Term | Claim Construction |
|---|---|
| unique to the user is correctly entered (claim 12) | user and entered by the user is accurate[2] |
| Wherein said registration system is replicated at the registration authority (claim 12) | Wherein the portion of the registration system that generates a security key from information input to software to be protected is reproduced exactly at the registration authority. This clarifies that only the portion of the registration system responsible for generating the security key must be replicated exactly at the registration authority, not the entire registration system. |
| Serial number (claim 14) | A number that is one of a series |
| Local licensee unique ID generating means (claims 1, 19, 20) Remote licensee unique ID generating means (claims 1, 19, 20) Registration key generating means (claim 17) | **Function**: to generate a local or remote licensee unique ID **Structure**: a summation algorithm or a summer and equivalents thereof |
| Mode switching means (claims 1, 19, 20) Mode-switching means (claim 17) | **Function**: to permit the digital data or software to run in a use mode if the locally generated licensee unique ID matches with the remotely generated licensee unique ID **Structure:** program code which performs a comparison of two numbers or a comparator and equivalents thereof |

---

[2] The District Court used the term "verification" rather than "checking" in its claim construction for this term. Ex. 1008, 53. We note the use of "checking" instead in the Decision on Institution is a typographical error. *See* Dec. on Inst. 8.

10

IPR2014-01453
Patent 5,490,216 C2

| Claim Term | Claim Construction |
|---|---|
| Platform unique ID generating means (claims 7–9) | **Function**: to generate a platform unique ID<br>**Structure**: a summation algorithm or a summer and equivalents thereof |

Regarding the Licensee Unique ID (claims 1, 19, 20), Security Key (claims 12, 13), and Enabling Key (claim 17) terms that are each construed to mean "a unique identifier associated with a licensee," the level of uniqueness need not distinguish an individual licensee from all other licensees or persons. As found by the District Court in construing these claim terms, "one-of-a-kind" uniqueness of the identifier "is inconsistent with the language of the '216 Patent itself." Ex. 1008, 11 (citing Ex. 1001, Abstr., 6:23–26 ("[I]n particular preferred forms, a serial number . . . is included in the registration number generation algorithm which introduces an additional level of uniqueness")). Because "unique" does not mean singularly unique, "'the licensee unique ID does not require personal information about the user,' so long as it is 'unique,' and not 'based solely on platform-related user information.'" *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1300 (Fed. Cir. 2011) (quoting *Uniloc USA, Inc. v. Microsoft Corp.*, 290 Fed. App'x 337, 342–43 (Fed. Cir. 2008)) (Ex. 1010, 11). Because the licensee unique ID need not be personal information about the user, it can be vendor-supplied information; it just cannot be "based solely on platform-related user information" as that disavowal comes from the '216 patent specification itself. *Id.* (citing *Uniloc USA, Inc.*, 290 Fed. App'x at 344); Ex. 1001, 2:5–7 (distinguishing prior art on the basis that "there is no suggestion or contemplation of linking platform identification with unique user identification").

11

IPR2014-01453
Patent 5,490,216 C2

Regarding Petitioner's assertion that certain claim terms lack definiteness or written description support, because those issues are neither appropriate for an *inter partes* review proceeding nor briefed by the parties, we do not address them in this decision. *See* 35 U.S.C. § 311(b). For purposes of this decision and for the reasons expressed by the District Court, we adopt and apply the constructions provided in the table above. *See* Ex. 1008, 53–54, 58–61.

### B.    *Priority Date for the Challenged Claims of the '216 Patent*

The '216 patent issued from U.S. Patent Application No. 08/124,718 ("the '718 application), filed September 21, 1993. Ex. 1001, [21]. The '718 application claims the benefit of the following foreign priority applications: (1) Australian provisional patent application PL4842 ("the '4842 application"), filed on September 21, 1992 (Ex. 1025); and (2) Australian provisional patent application PL5524 ("the '5524 application"), filed on October 26, 1992 (Ex. 1026).

In the Decision on Institution, we explained that, based on the record prior to instituting trial, we were persuaded by Petitioner's argument that the '4842 and the '5524 applications (collectively, "the Australian provisional applications") do not provide sufficient written description support for the "generating means" ("local licensee unique ID generating means," "remote licensee unique ID generating means," and "registration key generating means," collectively) and the "mode switching means" recited in independent claims 1, 17, 19, and 20. Dec. on Inst. 10–12 (citing Pet. 16–18). In particular, Petitioner argued that the structures identified in the District Court claim construction for performing the corresponding functions of the generating means and the mode-switching means are not present in

12

IPR2014-01453
Patent 5,490,216 C2

the Australian provisional applications. Pet. 15–18 (citing Ex. 1007 ¶¶ 23–27). For purposes of the Decision on Institution, we determined that Petitioner presented sufficient evidence indicating that the challenged claims of the '216 patent only are entitled to claim the benefit of the filing date of the '718 application—namely, September 21, 1993. Dec. on Inst. 11–12.

Although the burden of persuasion with respect to the unpatentability of the challenged claims remains with Petitioner, the burden of production of demonstrating that the challenged claims for the '216 patent are entitled to the earlier priority dates of the Australian provisional applications lies with Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1379–80 (Fed. Cir. 2015). Therefore, we turn to Patent Owner's showing whether the Australian Provisionals "necessarily disclose" or "reasonably convey" the structure for (1) a summation algorithm or a summer and equivalents thereof; and (2) program code, which performs a comparison of two numbers or a comparator and equivalents thereof. *See Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997) (a patentee demonstrates possession of the invention by describing it "in sufficient detail that one skilled in the art can clearly conclude that the inventor invented the claimed invention"); *Waldemar Link v. Osteonics Corp.*, 32 F.3d 556, 558 (Fed. Cir. 1994) (quoting *In re Rasmussen,* 650 F.2d 1212, 1215 (CCPA 1981)) ("The fact finder must determine if one skilled in the art, reading the original specification, would immediately discern the limitation at issue in the parent.").

## *1. Generating Means*

The structural disclosure in the '216 patent for the term "licensee unique ID generating means" and other "generating means" listed in the

13

above table is "a summation algorithm or a summer and equivalents thereof". *See* Ex. 1008, 25–27; Ex. 1010, 10, 20; Ex. 1001, 11:54–57, 12:62–65. The specific disclosure in the '216 patent specification was described by the District Court as follows:

> the only algorithm specified in the '216 Patent for generating a licensee unique ID is found in the sixth embodiment, which states:
>
>> The algorithm, in this embodiment, combines by addition the serial number 50 with the software product name 64 and customer information 65 and previous user identification 22 to provide registration number 66.
>
> '216 Patent, col. 11, ll. 53–56. Similarly, the only hardware component disclosed for performing the stated function is a 'summer.' *Id*. at col. 12, ll. 62–65.

Ex. 1008, 27.

Patent Owner contends that "[s]imilar structural language exists in the Australian Provisionals." PO Resp. 16. Specifically, Patent Owner relies on the following disclosures in the '4842 application text and Figure 2B as disclosing the claimed algorithm (*id*. at 16–17 (citing Ex. 1025, 4, Fig. 2B)):

> Preferably said registration number algorithm combines information entered by a prospective registered user unique to that user with a serial number generated from information provided by the environment in which the software is to run ([e.g.,] system clock, last modify date, user name).



Registration number generated from user details added to Serial number, and then encrypted and re-arranged

14

IPR2014-01453
Patent 5,490,216 C2

Fig. 2B, above, is a single box excerpted from a portion of a flowchart. *See* Ex. 1025, 5. Patent Owner asserts that the '5524 application contains similar disclosures and that "as a whole, each teaches a security key generated by a registration number algorithm that combines, by addition, information unique to an intended registered user, with a serial number." PO Resp. 17.

Patent Owner relies on the Declaration of Dr. Val DiEuliis (Ex. 2008) for the proposition that these disclosures of the Australian provisional applications convey to a person of ordinary skill in the art that "both the registration number and the serial number are numerical data (that is, numbers) and, as such, that FIG. 2B's disclosure of 'adding' means the addition of two numbers." PO Resp. 19 (citing Ex. 2008 ¶ 51). According to Dr. DiEuliis, Figure 2B "teaches that the algorithm that generates the registration number also adds the registration number (which was generated from user unique information) to the serial number . . . ." Ex. 2008 ¶ 53; PO Resp. 20. Dr. DiEuliis concludes that "the written description and figures taught an algorithm that uses addition to combine two numbers to arrive at a Licensee Unique ID, and that this algorithm would be 'fairly capable of categorization as a "summation algorithm,"' as explained by the Federal Circuit." Ex. 2008 ¶ 54; PO Resp. 20.

We are not persuaded by Patent Owner's evidence that the Australian provisional applications conveyed to a person of ordinary skill in the art a summation algorithm or a summer and equivalents thereof. The preponderance of the evidence is that the cited disclosures from the Australian provisional applications are insufficient for this purpose.

15

IPR2014-01453
Patent 5,490,216 C2

The two disclosures in the Australian provisional applications on which Patent Owner relies also appear in the '216 patent and are reproduced below from column 4 and Figure 2b:



The excerpt from column 4 states that "the registration number algorithm combines information entered by a prospective registered user unique to that user with a serial number" and the excerpted box from Figure 2b states that the "registration no. generated from user details added to serial no. is encrypted and re-arranged". Ex. 1001, 4:6–11, Fig. 2b. Despite these same two disclosures from the Australian provisional applications being present in the '216 patent, only the sixth embodiment in the '216 patent was found to provide structure for the generating means. Ex. 1008, 27 ("[H]aving scrutinized the '216 Patent in detail, the Court concludes that the only algorithm specified in the '216 Patent for generating a licensee unique ID is found in the sixth embodiment . . . ."); Ex. 1038, 24 ("There is no dispute that the generating means structure is fleshed out only in the sixth embodiment . . . ."). There is no dispute that the sixth embodiment is only present in the '216 patent; it is not disclosed in the Australian provisional applications. Therefore, these additional disclosures from the specification are insufficient for one skilled in the art to "immediately discern the

16

IPR2014-01453
Patent 5,490,216 C2

limitation at issue," namely, a summation algorithm.  *See Waldemar Link*, 32 F.3d at 558.

    In addition, we do not find credible Dr. DiEuliis's testimony that the text in Figure 2B, which states "registration no. generated from user details added to serial no. is encrypted and re-arranged," describes the addition of two numbers (registration no. and serial no.).  There is no previous step in the flowchart depicted in Figure 2B that describes the step of generating the registration number to indicate that the registration number is an input, rather than an output.  Ex. 1025, Fig. 2B; *see* Ex. 1026, Fig. 2.  Further, as explained next, the "user details" encompass text, which further explains why the flowchart is not discussing the addition of numbers.

    If the text box in Figure 2B is properly understood to describe the generation of the registration number from the inputs of user details and serial number, the Australian provisional applications lack a disclosure of how to combine user data and information that is in different formats.  Ex. 2009, 127:2–4, 62:19–23, 79:19–80:2, 125:7–14, 82:2–7, 87:13–18, 88:7–15, 132:24–133:14.  "[I]nformation entered by a prospective registered user" and "user details" are not necessarily numbers because user details includes such information as name and address according to the '216 patent and the Australian provisional applications.  *See* Ex. 1001, 3:50–53 ("Preferably, the information utilized by the local licensee unique ID generating means to produce the licensee unique ID comprises prospective licensee credit card number, date of birth and full name and address."); Ex. 1025, 7 ("The registration dialogue box C prompts the user for details unique to that user (including, for example, name, company, address, state, contact number) . . . ."); Ex. 1026, 8 ("The registration dialogue box C prompts the

17

IPR2014-01453
Patent 5,490,216 C2

user for details unique to that user (including, for example, name, company, address, state, contact number) . . . .").

Even if the flowchart box in the Australian provisional applications were to reasonably convey to one skilled in the art a simple addition operation of adding two numbers together, as Dr. DiEuliis contends by the addition of a registration number to a serial number (Ex. 2008 ¶ 53), that disclosure also would be insufficient to reasonably convey a summation algorithm. The summation algorithm structure is not simple addition. Ex. 1010, 20 (the Federal Circuit held that "[t]he structural disclosure in the '216 patent is not limited to simple addition in the colloquial sense of adding numbers together and nothing more"). As the Federal Circuit explained, the "combination by addition" taught by the sixth embodiment of the '216 patent "necessarily incorporates an initial step of converting the information into a common format to be added, which requires more than simple addition." *Id.*

Regarding the textual disclosure in the Australian provisional applications that the "registration number algorithm combines information" (Ex. 1025, 3), Patent Owner contends that the multitude of ways one could have combined information in 1992 would have narrowed to "summation" upon reading the totality of the Australian provisionals, particularly the "adding" disclosed in Figure 2B. PO Resp. 20–21 (citing Ex. 2008 ¶¶ 58, 61). A disclosure of a genus is not necessarily a disclosure of all of its species, however. *In re Baird*, 16 F.3d 380, 382 (Fed. Cir. 1994). We are not persuaded by Patent Owner's evidence that the disclosure teaches combination by addition based on the trial record. Dr. Madisetti testified that there are a number of different ways to combine letters and numbers

18

IPR2014-01453
Patent 5,490,216 C2

without mathematical addition. Ex. 1007 ¶ 24; Ex. 2009, 121:13–124:1, 128:5–16, 128:25–129:12, 132:11–20, 154:22–155:5. As examples of how information can be combined in a non-mathmatical manner, Dr. Madisetti testified that "[y]ou could put a code for the different digits and scramble them up. You could take portions of each and try to create another registration number. You could use different operations in different ways." *Id.* at 121:20–24. Dr. Madisetti also testified that the word "add" does not necessarily mean "sum" because it can also describe "adding a redundancy" and "add[ing] a header". Thus data can be amalgamated into an alphanumeric number to form a registration number. *See* Tr. 83. We credit Dr. Madisetti's testimony on the meaning of "add" and "combine" in the context of the Australian provisional applications. In addition, Patent Owner does not dispute that there is more than one way to combine information. *Id.* at 44 ("[T]here are only two forms of combining information in the totality of the evidence in this case: Summation, the mathematical operation, and concatenation").

At oral hearing, Patent Owner argued that the sixth embodiment in the '216 patent that describes the summation algorithm structure for the claimed generating means incorporates by reference prior embodiments including "everything that is disclosed in figure 2." *Id.* at 41. It is Patent Owner's position that for the summation algorithm structure disclosed in the sixth embodiment in the '216 patent, "there is [] traceability back to the Australian provisionals." *Id.* at 42. As Petitioner pointed out in rebuttal, however, the '216 patent characterizes the disclosures that also appear in the Australian provisionals as a "generalized description". Ex. 1001, 11:40–43; Tr. 84. Thus, in the context of the '216 patent itself, the disclosures that appear in

19

the Australian provisional applications do not convey the specific algorithm disclosed in the sixth embodiment, namely, combination by addition, nor an equivalent, but, rather, a generalized description. *See* Ex. 1001, 11:53–56.

In sum, we credit Dr. Madisetti's opinion on whether one of ordinary skill in the art would have immediately recognized from the Australian provisional applications the structure of a summation algorithm or summer and its equivalents. Accordingly, we find that the preponderance of the evidence supports the earliest priority date of September 21, 1993 for the '216 patent based on the earliest disclosure of structure and hardware for the claim term "licensee unique ID generating means" and similar terms "remote licensee uniuqe ID generating means," and "registration key generating means".

### 2.  *Mode Switching Means*

The structural disclosure in the '216 patent for the term "mode switching means" is "program code which performs a comparison of two numbers or a comparator and equivalents thereof". *See* Ex. 1008, 41–44; Ex. 1001, 13:37–40 ("Comparator 90 together with gates 91, 92, and relay 93 comprise one particular form of mode switcher or switching platform 83 of various kinds of code such as the code of types D and U"), 6:12–14 ("[m]ode switching means can comprise execution of the code portion which additionally performs a comparison of the locally and remotely generated registration numbers").

Patent Owner asserts that the function of the mode switching means is described in the '4842 application as follows:

> As the final stage in registration the registration authority 16 provides the registration number generated by the registration authority PC 15 to the user 11. The user 11 enters the registration

20

IPR2014-01453
Patent 5,490,216 C2

> number into the user PC 12 where the security routine checks to
> see whether the entered registration number matches the
> calculated registration number.  If the two match then a valid
> registration has taken place and access is provided by the security
> routine to a full operating version of the software protected by
> the security routine.

Ex. 1025, 6–7; PO Resp. 26 (citing Ex. 2008 ¶ 63).  Patent Owner further

asserts one skilled in the art would have understood from the above

disclosure in the Australian provisional applications that (1) they "teach a

software invention", (2) "a 'routine attachable to software' is software," (3)

"'software' is implemented with 'program code'", and (4) "the terms

'program code' and 'software' are often used interchangeably."  PO Resp.

27 (citing Ex. 2008 ¶¶ 65, 66).  Patent Owner also relies on Figure 2B of the

Australian provisional applications as supporting disclosure of a "mode

switching means".  *Id*. at 28 (citing Ex. 2008 ¶ 68).  At the oral hearing,

Patent Owner argued that the third block from the top on the right side of

Figure 2B is a decision block that is a software equivalent to a comparator

and a model for software, which is program code.  Tr. 47–48; Ex. 1025, 13.

Figure 2B is shown below:

21

IPR2014-01453
Patent 5,490,216 C2



According to Patent Owner, Figure 2B shows a decision block in the third
block from the top ("Application uses unlocking algorithm to check
validity") because there is an input and two outputs that are a "yes" and a
"no". PO Resp. 28 (citing Ex. 2008 ¶ 68); Ex. 1025, 13; Tr. 47.

Patent Owner provides evidence that the function of the mode
switching means was disclosed in the Australian provisional applications,
but not the structure, namely, program code or its equivalent, or the
hardware, a comparator. The fact that the security routine, which provides
the function, is "attachable to software" and that software is "often used
interchangeably" with program code, is not evidence that one of ordinary
skill in the art would have clearly concluded from the Australian
provisionals that program code, or an equivalent, is the structure that
performs the mode switching means function. *See Lockwood*, 107 F.3d at

22

IPR2014-01453
Patent 5,490,216 C2

1572.  Moreover, Patent Owner does not provide evidence of a comparator or an equivalent being disclosed in the Australian provisionals to demonstrate that the inventor was in possession of the invention at the time of the filing of the Australian provisional applications.  *See id.*  Figure 2B does not reasonably convey a comparator, nor does the record reflect evidence that the block in Figure 2B to which Patent Owner directs us is a comparator or an equivalent.

Accordingly, we find that the preponderance of the evidence supports the earliest priority date of September 21, 1993 for the '216 patent based on the earliest disclosure of structure and hardware for the claim term "mode switching means".

### 3.    Conclusion

The preponderance of the evidence on this record shows that the earliest priority date to which the '216 patent claims are entitled is September 21, 1993.  We, therefore, discern no reason to alter our determination in this regard for the purposes of this Final Written Decision.

### C.    Patentability

To prevail on its challenges to the patentability of claims, Petitioner must prove unpatentability by a preponderance of the evidence.  35 U.S.C. § 316(c); 37 C.F.R. § 42.1(d).

### 1.    Principles of Law

### a.    Anticipation

In order for a prior art reference to serve as an anticipatory reference, it must disclose every limitation of the claimed invention, either explicitly or inherently.  *In re Schreiber*, 128 F.3d 1473, 1477 (Fed. Cir. 1997).  We must

IPR2014-01453
Patent 5,490,216 C2

analyze prior art references as a skilled artisan would.  *See Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed. Cir. 1991), overruled on other grounds by *Abbott Labs. v. Sandoz, Inc.,* 566 F.3d 1282 (Fed. Cir. 2009) (to anticipate, "[t]here must be no difference between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention").

### b.    *Obviousness*

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying factual determinations including:  (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness.  *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).  An invention "composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art."  *KSR*, 550 U.S. at 418.  Moreover, a determination of unpatentability on the ground of obviousness must include "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness."  *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006).  The obviousness analysis "should be made explicit" and it "can be important to identify a reason that would have prompted a person of ordinary skill in the

24

IPR2014-01453
Patent 5,490,216 C2

relevant field to combine the elements in the way the claimed new invention does." *KSR*, 550 U.S. at 418.

### 2. *Schull (Ex. 1002)*

Petitioner asserts that claims 1–11 and 17–20 of the '216 patent are anticipated by Schull under 35 U.S.C. § 102(e). Pet. 19–37. Petitioner also asserts that claims 10 and 11 would have been obvious over Schull under 35 U.S.C. § 103(a). *Id.* at 53. Having determined that the earliest priority date of the '216 patent is September 21, 1993, we confirm that Schull is prior art to the '216 patent under 35 U.S.C. § 102(e) because it issued from an application filed in the United States on December 15, 1992. *See* Ex. 1002, [22].

### a. *Overview of Schull*

Schull teaches a method of distributing, registering, and purchasing digital information whereby access to advanced features of the digital information is given in the presence of a valid password that is generated on the user's system. Ex. 1002, Abstr. The password is generated using ID target information that can be unique to the user, such as the user's voice or telephone number, or specific to the user's processor. *Id.* at 5:20–47; 6:65–7:27; 8:26–30; 17:13–20. An algorithm is used to transform the information into a unique ID. *Id.* at 7:16–27. The same password-generating algorithm is used on a licensing processor that is remote from the user's computer to transmit the password back to the user's processor where it is installed and found for subsequent executions or boots. *Id.* at 6:1–11, 8:55–9:4, 11:8–13, 35–40, 51–54. A check is conducted between the user's processor and the licensing processor to determine whether the installed password correctly matches the password generated in the user's processor. *Id.* The protected

25

IPR2014-01453
Patent 5,490,216 C2

software may then be run on a user's processor, which "is typically a traditional computer". *Id*. at 6:46–53.

### b. Anticipation of Claims 1–11 and 17–20

The key issue disputed by the parties is whether Schull teaches the "generating means" required by the claims. Petitioner contends that the preferred algorithm taught by Schull is a summation algorithm or an equivalent and provides the Madisetti Declaration in support of its position. Pet. 21 (citing Ex. 1007 ¶¶ 40–47). According to Dr. Madisetti, the preferred algorithm disclosed in Schull is a summation algorithm because it prominently uses addition to perform the function of generating an ID. Ex. 1007 ¶¶ 40–47.

Petitioner also argues that the presence of an operating system, as required by dependent claims 10 and 11, is implicitly if not expressly present in Schull's disclosure because traditional personal computers were almost universally being used by 1993, thus any program running on a computer would have been adapted to run under that operating system or in an operating system environment. Pet. 22–23. Petitioner alternatively argues that claims 10 and 11 would have been obvious in view of Schull. *Id.* at 53. For both positions, Petitioner provides the Madisetti Declaration as evidence. Ex. 1007 ¶ 38.

Patent Owner contends that Petitioner's challenge based on Schull is defective "because Schull fails to teach a summation algorithm, summer, or equivalent structure for anticipating the licensee unique ID generating means." PO Resp. 33 (citing Ex. 2008 ¶¶ 75–105). According to Patent Owner, Schull uses "concatenation" to generate its "Passwordable ID" and "concatenation" is not a summation algorithm. *Id*. at 33–34 (citing Ex. 2008

26

IPR2014-01453
Patent 5,490,216 C2

¶ 77).  Dr. DiEuliis describes concatenation as

> the linking together of entities (e.g., characters or numbers), not
> a mathematical computation, summation or otherwise.  In a
> computer system, data is stored in memory as a linear array of
> bytes, and concatenation is normally accomplished by copying
> the data to a contiguous section of memory so that the result is
> stored as a continuous array.

Ex. 2008 ¶ 78.  Dr. DiEuliis provides as an example of concatenation "the

concatenation of three numbers—X=1234; Y=56; Z=789—to arrive at the

number 123456789" provided in Dr. Madisetti's declaration.  *Id.* ¶ 82 (citing

Ex. 1007 ¶ 44).  According to Dr. DiEuliis, to concatenate these three

numbers stored in memory requires rearranging the numbers by moving or

copying into a contiguous section of memory.  "To accomplish this

rearrangement, at most, the program need only to move each byte to its new

location in memory."  *Id.* ¶ 83.  Dr. DiEuliis states "[m]oving data from one

memory location to another . . . is a basic processor operation and is fast and

efficient.  Any type of arithmetic operation such as addition by byte-wide or

multi-byte numbers is much more complicated and significantly slower."  *Id.*

(footnote omitted).

Because Petitioner relies upon the Declaration of Dr. Madisetti to

explain the method of concatenation in Schull, Patent Owner argues that

Petitioner supplements the teachings of Schull with other teachings of Dr.

Madisetti.  PO Resp. 40; Tr. 52.

Patent Owner does not present separate argument as to anticipation of

claims 1–11 and 17–20 by Schull and obviousness of 10 and 11 over Schull.

PO Resp. 32–40, 60.

The passages at issue in Schull describing the algorithms by which

the Passwordable ID is generated read:

27

IPR2014-01453
Patent 5,490,216 C2

> The ID must be generated in such a way that two ID-Targets will generate different IDs. Also, in order that a plurality of Licensed-features in a plurality of software programs be independently licensable on the same ID-Target, any two Licensed features must be able to generate different IDs even in conjunction with a single ID-Target. Those familiar with the art will recognize that this can be achieved a variety of ways, in one preferred embodiment, each item of protected software is assigned an adequately unique P-digit Program ID, and each licensed Feature is assigned an F-digit Feature-ID, and each ID-Target can be associated with a T-digit Target-ID such as a serial number. Once assigned (using methods described below) these ID numbers are combined in a fashion which preserves their uniqueness (e.g., by concatenating them to produce a number with N+M+T digits capable encoding $10^{\hat{}(N+M+T)}$ values) and then using this combination, an encryption of it, or some other adequately-unique transform of it, as the ID.

Ex. 1002, 7:10–27.[3] Schull goes on to describe "error-checking" by having the Passwordable ID "satisfy some kind of coherence constraint" that "would be to append two more digits to the ID which would constitute a checksum for the preceding digits." *Id.* at 7:28–36.

We are persuaded by Petitioner's argument that Schull discloses a summation algorithm for generating its Passwordable ID. As explained by Petitioner, Schull's algorithm combines three ID numbers: Program ID, Feature ID, and Target ID, which Petitioner refers to as X, Y, and Z in its explanation. Pet. 21. The X number has "N" digits, the Y number has "M" digits, and the Z number has "T" digits. *Id.* The algorithm combines the numbers X, Y, and Z "(e.g., by concatenating them to produce a number

---

[3] Patent Owner does not dispute Dr. Madisetti's observation that Schull contains a typographical error (referring first to P, F, and T-digits and then to N, M, and T-digits) and his determination that N and M are equivalent to P and F. Ex. 1007 ¶ 41.

IPR2014-01453
Patent 5,490,216 C2

with N+M+T digits)". Ex. 1002, 7:24–25; Pet. 21; Ex. 1007 ¶ 41.  In 1992, concatenating three integers to produce the desired result "boils down to two basic approaches:  (1) multiplying the first integer and second integer by a power of ten (dependent on the number of digits of the subsequent numbers) and adding the three integers together, or (2) converting the integers to 'strings,' concatenating the strings, and converting the result back to an integer." Ex. 1007 ¶ 42.  Using the former approach to produce a number with the combined number of digits as the numbers being combined, which Petitioner argues is the one disclosed in Schull, Dr. Madisetti describes the mathematical operations that can be performed programmatically.  The mathematical operation provided by Dr. Madisetti is $X*10^{(M+T)} + Y*10^T + Z$, which uses multiplication and addition. *Id*. ¶¶ 44; Pet. 21.  According to Dr. Madisetti, this approach is a summation algorithm and is "computationally quicker" for the reason that "it is a matter of performing basic calculations and processing smaller numbers, as opposed to converting, combining and reconverting large strings . . . ." Ex. 1007 ¶ 43.

To explain why Dr. DiEuliis is incorrect about Schull using the other method of concatenating three integers to generate the PasswordableID, Petitioner submits with its Reply a Supplemental Declaration of Dr. Vijay K. Madisetti (Ex. 1039).  Pet. Reply 9–10.  In his Supplemental Declaration, Dr. Madisetti provides a detailed explanation based on Schull's teachings about the programming used to generate a PasswordableID.  Ex. 1039 ¶¶ 7– 14.  Regarding how the invention of Schull is implemented, Schull states that "[o]ne object of [its] invention is to allow programmers to conveniently invoke the first-described methods by adding a relatively small number of lines of code to their own programs." Ex. 1002, 12:46–50.  Schull further

29

IPR2014-01453
Patent 5,490,216 C2

discloses that this object can be achieved by implementing "Pascal language" and discloses programming that describes the Passwordable ID as a "longint." *Id*. at 12:53–14:13; Ex. 1039 ¶¶ 7–14. According to Dr. Madisetti, "longint" means the Passwordable ID is "a single integer, single number, or a whole number." Ex. 1039 ¶ 11. Concatenating a PasswordableID in the manner described by Dr. DiEuliis would not produce a single integer, single number, or a whole number because the components of the number of would maintain their separate identities stored in separate places in memory. *Id*. ¶¶ 15–16. In view of the evidence before us, we are persuaded that Schull's longint concatenating implementation describes a summation algorithm.

Even if the concatenating procedure disclosed by Schull for generating a Passwordable ID does not necessarily utilize a "summation algorithm" or equivalent, we find that Schull's disclosure of appending two additional digits to the concatenated number using a checksum does. Schull describes this further step in creating the Passwordable ID as being for the purpose of error checking. Ex. 1002, 7:28–36. The preponderance of evidence on this record is that a checksum is a summation algorithm. Dr. Madisetti testifies that "[a]s of 1992, using a checksum to detect an error in a number, as described by Schull, was done using what is known as a 'check digit[,]' [and all] of the methods for calculating check digits utilize some form of addition." Ex. 1007 ¶ 48. Dr. DiEuliis confirmed that most checksums use addition and that he had never created a checksum that did not use summation. Ex. 1041, 63:10–17, 88:8–10. In addition, the publications relied upon by Dr. DiEuliis for disclosing checksum methods also confirms that summation is used in those methods. Ex. 1039, 24–36;

30

IPR2014-01453
Patent 5,490,216 C2

2009, 144:16–20.  The issue of whether a checksum is a summation algorithm was also answered in the affirmative in prior litigation involving the '216 patent.  Ex. 1032, 177:7–21; Ex. 1042, 20–21; Ex. 1010, 17, 24; Ex. 1037, 30, 41–42; Ex. 1033, 52, 53–55; Ex. 1016, 27; Ex. 1041, 61:21–62:20, 70:8–72:22, 80:10–81:21.  Therefore, Schull discloses a licensee unique ID generating means because Schull discloses the step of appending digits for error-checking purposes to the Passwordable ID using a checksum.

At oral hearing, Patent Owner asserted that (1) Petitioner is relying on an inherency argument to establish that Schull used a summation algorithm, (2) that inherency argument must fail because the experts agree that there are two methods in which concatenation may be performed, and (3) [t]here is no express disclosure in Schull for using summation, only concatenation."  Tr. 52–55.  When asked how the other form of concatenation would produce a long integer, Patent Owner conceded that there is no evidence in the record to that level of detail.  *Id*. at 54:8–16 ("We don't have expert testimony on that level of detail").

After considering Petitioner's and Patent Owner's positions, as well as their supporting evidence, we credit Dr. Madisetti's testimony regarding the disclosures in Schull describing the use of a summation algorithm to generate the PasswordableID.   For the reasons provided by Petitioner, we determine that the preponderance of the evidence demonstrates that claims 1–11 and 17–20 would have been anticipated by Schull.  *See* Pet. 19–37; Pet. Reply 9–14.

### c.  *Obviousness of Claims 10 and 11*

Claim 10 depends from claim 1 and recites "said platform comprises a computer operating system environment."  Ex. 1001, 14:35–36.  Claim 11

31

IPR2014-01453
Patent 5,490,216 C2

depends from claim 10 and further requires "said digital data comprises a software program adapted to run under said operating system environment." *Id*. at 14:37–39. Petitioner argues that if Schull's disclosure of a traditional computer on which protected software may be run is not sufficient to anticipate dependent claims 10 and 11, then "modifying the 'traditional computer' of Schull to include an operating system under which protected software can be run would have been obvious to one of skill in the art." Pet. 53 (citing Ex. 1007 ¶ 38). Patent Owner contends that claims 10 and 11 are not unpatentable because Schull is not prior art. PO Resp. 60.

A disclosure that anticipates under 35 U.S.C. § 102 generally renders the claim unpatentable under 35 U.S.C. § 103, because anticipation is the "epitome of obviousness." *See In re Fracalossi*, 681 F.2d 792, 794 (CCPA 1982); *In re Pearson*, 494 F.2d 1399, 1402 (CCPA 1974). For the reasons we find that claims 10 and 11 have been shown by a preponderance of the evidence to be anticipated by Schull, we also determine that Petitioner has shown by a preponderance of the evidence that claims 10 and 11 are unpatentable under 35 U.S.C. § 103(a) as obvious over Schull.

We further find that if Schull's disclosure of a "traditional computer" is not a disclosure of a personal computer with an operating system, the preponderance of the evidence on this record shows that it would have been obvious to modify Schull's traditional computer to include an operating system under which protected software can be run as required by claims 10 and 11. According to Dr. Madisetti, "operating systems for personal computers had become ubiquitous and necessary to the operation of software on the computer" prior to 1993. Ex. 1007 ¶ 38. Dr. Madisetti testifies to the introduction of Windows 3.1 in April 1992, the release of Apple's

32

IPR2014-01453
Patent 5,490,216 C2

System Software in 1984, System 7 in 1991, and LINUX in 1991. *Id*. The '216 patent also identifies existing operating system environments. Ex. 1001, 2:32–36. These facts are not disputed by Patent Owner. Therefore, if Schull's traditional computer did not include an operating system environment on which software can be run, it would have been obvious to modify Schull with a computer that did include an operating system environment. Accordingly, the preponderance of the evidence supports our finding that claims 10 and 11 would have been obvious over Schull.

### 3.    *Logan (Ex. 1003) and Grundy (Ex. 1004)*

Petitioner asserts that claims 12–14 are anticipated under 35 U.S.C. § 102(e) by Logan (Pet. 37–41) and claims 15 and 16 would have been obvious under 35 U.S.C. § 103(a) over the combination of Logan and Grundy (*id*. at 41–46). Claim 12 requires that the registration system "is replicated at a registration authority and used for the purposes of checking by the registration authority that the information unique to the user is correctly entered at the time that the security key is generated by the registration system." Ex. 1001, 14:45–49. Claim 15 depends from claim 12 and further requires that "said registration system checks at the time of boot of said software as to whether it is a first boot of the software to be protected or a subsequent boot". *Id*. at 14:57–60.

### a. *Overview of Logan*

Logan discloses a method and system for protecting a software program. Ex. 1003, Abstr. A first software code or serial number is provided by the vendor that is unique to each original copy of the software. *Id*. at 4:19–31. A second software code is stored within the software that the software supplier is able to identify by reference to the first software code.

33

IPR2014-01453
Patent 5,490,216 C2

*Id*. at 4:32–43.  The user must provide the software supplier with the
hardware and software serial numbers.  *Id*. at 6:33–39.  An activation code is
generated by the software supplier by adding together the serial numbers and
in the same manner accomplished by the software locally to generate a first
intermediate code.  *Id*. at 6:51–67.  A mathematical operation is performed
on the first intermediate code and the activation code to produce a second
intermediate code.  *Id*. at 5:53–65.  The program compares the second
intermediate code with the second software code and, if they are identical,
then the user is permitted to operate the software uninhibited.  *Id*. at 5:67–
6:7.

### b.  Anticipation of Claims 12–14

Petitioner asserts that the disclosures in Logan anticipate claims 12–
14.  Pet. 37–41.  Petitioner identifies Logan's first intermediate code as the
security key required by independent claim 12 and Logan's first software
code or serial number as the information uniquely associated with a person
who intends to become a licensee that the user inputs.  *Id.* at 38–39.  Logan's
software supplier is identified as the registration authority that checks
whether the software serial number entered by the user is accurate because
the second intermediate code will not match the stored hidden number if the
serial number is not correctly input by the user.  *Id*. at 40.

Patent Owner contends that the first intermediate code derived in
Logan "is not generated from information unique to the user because
different users who install copies of the software will have the same
software serial number."  PO Resp. at 41–42 (citing Ex. 2008 ¶ 121; Ex.
1003, 6:7–29).  According to Patent Owner, vendor-supplied information
may be an input to generate a "security key," but it is not necessarily

34

"information that is uniquely associated with a person" as recited in claim 12. *Id.* at 43. Patent Owner also contends that Logan's system does not anticipate the final element required by claim 12, "checking by the registration authority that the information unique to the user is correctly entered at the time the security key is generated by the registration system" because "the temporal aspect of the checking (i.e. 'at the time the security key is generated') is not disclosed anywhere in Logan." *Id.* at 45 (citing Ex. 2008 ¶ 131). Patent Owner further contends that Petitioner's citation to Logan for this element is misleading because Logan "describes actions that take place on the user's computer, not actions taken by the software supplier." *Id.*

Regarding whether Logan's first intermediate code is an identifier associated with the licensee, the uniqueness of the identifier will vary depending on the inputs by the user, which may include vendor supplied information and does not require personal information of the user according to the claim construction analysis of record. *See* Ex. 1008, 16–21; Ex. 1009, 11. Logan teaches that the software serial number is unique to each original copy of the software and that it is combined with the hardware serial number input by the user to generate the first intermediate code. Ex. 1003, 4:19–31 ("Each original copy or embodiment of the computer software has a first software code which is uniquely associated with that one particular embodiment"), 4:65–5:30; *see* Pet. 38–39. The preponderance of evidence in this record also supports a serial number supplied by a vendor being unique to the user. Ex. 1046, 27: 1–3 (the inventor of the '216 patent testifying that "the serial numbers of each piece of software . . . identifies the owner of the software . . ."), 29:1–3 (the inventor of the '216 patent

IPR2014-01453
Patent 5,490,216 C2

testifying that his idea was "linking a serial number to a specific machine");
Ex. 1044, 10 (Patent Owner arguing in district court that it "expressly
contemplates information that is not one-of-a-kind"); Ex. 1016, 39 (Patent
Owner arguing during reexamination that nexus between the claims and
some commercial embodiments was satisfied because they used "a unique
serial number . . . that is assigned to each copy of the software"); Ex. 1008,
12 (District Court finding in its claim construction of "unique" that "[t]o
construe the word unique to mean no possibility of duplication would simply
be inconsistent with the specification."). In addition, the claim construction
analysis explicitly rejected "one-of-a-kind information that
describes/identifies a person" when construing "information . . . which
uniquely identifies an intended registered user" recited in claim 12. Ex.
1008, 22.

At the oral hearing, Patent Owner conceded that the Federal Circuit
held that vendor-provided information "could be" the basis for a licensee
unique ID, but argued that whether a particular vendor supplied information
is uniquely associated with a licensee is a fact question. Tr. 61–62. In
Logan, the software serial number is input by the user together with the
hardware serial number to generate the first intermediate code. Therefore,
the information inputted by the user is not solely platform related and
together with the hardware serial number "uniquely identifies an intended
registered user" as recited in claim 12 compared to the software serial
number alone. Accordingly, we are persuaded that the first intermediate
code meets the recited "security key" requirement of claims 12–14, as that
term is construed.

36

IPR2014-01453
Patent 5,490,216 C2

Logan also teaches that the accuracy with which the software serial number is input by the user would be checked by the registration authority because "the software supplier is able to identify the second software code for each particular embodiment of the software by reference to the first software code or serial number." Ex. 1003, 4:37–40. It is also checked by the registration authority in Logan by preventing full access to the digital data if the second intermediate code does not match the stored hidden number. *Id*. at 5:65–6:7; *see* Pet. 39–40. Regarding whether algorithms are replicated at a registration authority in Logan, Patent Owner does not dispute that the same algorithm is replicated at the registration authority to produce the first intermediate code. We do not read into the claims a temporal limitation requiring that the security key is generated at the same time at the local and remote locations, as argued by Patent Owner. Claim 12 requires that the registration system is replicated at the registration authority for the purpose of check on the information unique to the user. Therefore, we are persuaded that the registration authority disclosed by Logan meets the requirements of claims 12–14.

After considering Petitioner's and Patent Owner's positions, as well as their supporting evidence, we determine that Petitioner has shown by a preponderance of the evidence that claims 12–14 would have been anticipated by Logan.

### c. Overview of Grundy

Grundy is directed to "a computer-based method and apparatus to control the distribution of information . . . whereby a user of computer software becomes the primary agent of manufacture and distribution of the software under the direct monitoring and control of a centralized control

37

IPR2014-01453
Patent 5,490,216 C2

point." Ex. 1004, 1:7–13. The software is "capable of being operated in two modes." *Id*. at 4:28–29. "The first mode is a full-function mode, where all the functions and features of the software product are available to the user" and "[t]he second mode is an evaluation mode, where only certain functions, decided by the software developer, can be accessed by the user." *Id*. at 4:29–34. The software product in evaluation mode is distributed to the user community. *Id*. at 9:3–6. The user "is in fact supplied with a complete copy of the software, but can not operate the software in full-function mode until after the registration process . . . is completed." *Id*. at 9:14–17. An ownership check is performed "[e]ach time a user starts the software product" in order to determine whether the software should be executed in an "evaluation mode" or "full-function mode". *Id*. at 5:37–48.

### d. Obviousness of Claims 15 and 16

Petitioner asserts that, like Logan, Grundy also teaches a system for ensuring that copied software is properly registered (Pet. 41), but differs from Logan in that the software runs in both a demonstration or evaluation mode and a full-function mode depending on an ownership check each time the software is executed (*id*. at 41–42). Petitioner argues that it would have been obvious to one of ordinary skill in the art to combine the option of running software in a demonstration mode, as taught by Grundy, with the software protection system of Logan, because Grundy teaches "the benefit of providing an evaluation mode to a software consumer is to allow the consumer to try and evaluate features of the product prior to making a decision to purchase." *Id*. at 42 (citing Ex. 1004, 4:27–36, 9:6–11; Ex. 1007 ¶¶ 49–57). Petitioner contends that modifying the software registration system of Logan with the ownership check process of Grundy would have

38

IPR2014-01453
Patent 5,490,216 C2

been within the skill and common sense for a skilled artisan; it would have provided the predictable result of executing the software in two different modes as described by Grundy; and claims 15–16 would have been obvious over the combination. *Id*. at 42–46. Petitioner provides the Madisetti Decl. as evidence to support the obviousness of claims 15 and 16 over the combination of Logan and Grundy. *Id*. (citing Ex. 1007 ¶¶ 52–57).

Patent Owner contends that "[t]here is no disclosure in Grundy's system to check at the time of boot whether it is a first or subsequent boot." PO Resp. 47. According to Patent Owner, Grundy teaches away from claim 15 because it "emphasi[zes] an entirely different check—the mode check—at start up." *Id*. (citing Ex. 2008 ¶ 139). Patent Owner further contends that the requirements of claim 15 are not met because "neither *Logan* nor *Grundy* disclose detecting first or subsequent boots." *Id*. at 48 (citing Ex. 2008 ¶ 142). Regarding the reason to combine Logan and Grundy, Patent Owner argues that one skilled in the art would have not modified Logan with the demo mode feature of Grundy because "[t]he common sense approach to adding a demonstration mode to a software product in view of Logan and Grundy would have been to abandon Logan and incorporate Grundy alone." *Id*. at 49 (citing Ex. 2008 ¶ 146).

After considering Petitioner's and Patent Owner's positions as to claims 15 and 16, as well as their supporting evidence, we determine that Petitioner has shown by a preponderance of the evidence that those claims are unpatentable under 35 U.S.C. § 103(a) as obvious over Logan and Grundy. Regarding detecting first or subsequent boots as required by claim 15, Grundy discloses the step of determining "if this is the first use," which indicates a first or subsequent boot, by checking whether an ownership

39

IPR2014-01453
Patent 5,490,216 C2

details record exists every time the software is executed.  *See* Ex. 1004, 16:41–49; Ex. 1007 ¶ 52.   If no details are present, an initialized ownership record will be created.  Ex. 1004, 16:41–49.  On a subsequent boot, an ownership record will exist and be checked to determine whether the software should run in evaluation or full-function mode.  *Id*. at 5:37–48, 16:18–17:39.  Therefore, the preponderance of the evidence supports Petitioner's argument that claims 15 and 16 would have been obvious over the combined teachings of Logan and Grundy.  Petitioner also provides a reason for combining this particular feature of Grundy with the system of Logan, namely, "allow[ing] potential users to try and evaluate features of the software product" as stated by Grundy.  Ex. 1004, 4:34–36; Pet. 42.  Therefore, Petitioner's reason to modify the teachings of Logan with the teachings of Grundy is apparent from Grundy and has a rational underpinning.  *See KSR*, 550 U.S. at 418.

### 4.    *Haines (Ex. 1005) and Manduley (Ex. 1006)*

Petitioner contends that claims 12–14 would have been obvious under 35 U.S.C. § 103(a) over Haines and Manduley.  Pet. 46–53.

### a.  *Overview of Haines*

Haines discloses a system for reconfiguring postage meters that selectively enable and disable features.  Ex. 1005, Abstr.  The user's meter generates a request code number from user-entered information in both systems.  *Id*. at 5:1–6:48.  Haines discloses that the meter and the data center each use the same encryption routine and input numbers so that the data center can control the feature set of the meter.  *Id*. at 4:17–26.  The data center computer in Haines checks that its configuration request code matches the configuration request code generated by the user's meter.

40

IPR2014-01453
Patent 5,490,216 C2

Haines states that if "the agent has improperly entered numbers," the codes will not match. *Id*. at 7:15–26.

### b. Overview of Manduley

Manduley also discloses a system that selectively activates and unactivates features in a data processing device, such as a parcel manifest system. Ex. 1006, Abstr., 1:35–39. The user's meter generates a request code number from user-entered information as in Haines' system. *Id*. at 5:63–6:50. Manduley expressly discloses location data is entered by the user, such as "zip code or other data identifying the location" of the device. *Id*. at 5:53–6:50. "From that information, the data center determines the identity of the customer holding that device 20 and checks the customer's file to determine whether the request is appropriate (step 210)." *Id*. at 7:63–8:2.

### c. Obviousness of Claim 12

Petitioner argues that it would have been obvious to one of ordinary skill in the art to modify the system of Haines with the use of location data as the information that the user inputs because Manduley teaches the benefit of using location data is to allow the data center to determine the customer identity. Pet. 47 (citing Ex. 1006, 7:63–8:2). Petitioner provides as evidence in support of its position the Madisetti Declaration, which characterizes the modification of Haines as a substitution that is contemplated by Haines's suggestion that "other meter specific identifying information" may be used instead of an ascending register value in generating a request code. Ex. 1007 ¶ 61 (citing Ex. 1005, 5:28–30). Petitioner also argues that the use of a zip code, as in Manduley, is

41

IPR2014-01453
Patent 5,490,216 C2

exemplified as a user input to generate the security key in the '216 patent. Pet. 47 (citing Ex. 1001, Fig. 4).

Patent Owner contends that Haines and Manduley are not analogous art to the '216 patent because "neither reference is directed towards a user who desires to obtain a license, install, and use software on their computer" and, as such, one skilled in the art would not look to these references "to solve the problems that the inventor of the '216 Patent faced." PO Resp. 52 (citing Ex. 2008 ¶ 152); *id.* at 55. Patent Owner asserts that neither discloses "licensing procedures or a registration system" or "installation of software into a user's computer" because both teach "select[ing] operating features already installed in a device." *Id.* at 52 (citing Ex. 2008 ¶ 154); *id.* at 54.

Patent Owner further contends that Haines has not been shown to disclose the "registration system" preamble of claim 12 because "none of the cited passages disclose any licensing procedure". *Id.* at 56. In addition, Patent Owner asserts that neither Haines nor Manduley discloses the use of information that is uniquely associated with a person who intends to become a licensee as required by independent claim 12. *Id.* at 57. Patent Owner also argues that Petitioner's reason for combining Haines's system with the zip code input taught by Manduley is not supported by the record because Manduley identifies the location of the device, not the agent, and "the data center computer in Haines already knows the identity of the agent." *Id.* In addition, Patent Owner asserts that the "agent" disclosed by Haines and Manduley cannot be the "intended registered user of said software on a computer on which said software is to be installed" as recited in claim 12 because "the owner of the business or home (or a post office) is the user of the meter." *Id.* at 58 (citing Ex. 2008 ¶ 180). According to Patent Owner,

42

IPR2014-01453
Patent 5,490,216 C2

Petitioner has not identified "an intended registered user of said software on a computer on which said software is to be installed", "any user's computer on which software is to be installed", or "'licensee,' 'licenses,' or 'licensing procedures'" as recited in claim 12. *Id.* (citing Ex. 2008 ¶¶ 181, 182).

Based on the trial record, we find the preponderance of the evidence supports Petitioner's assertion that claim 12 would have been obvious over the combination of Haines and Manduley. As an initial matter, we find Haines and Manduley to be analogous art. The PTO and its reviewing courts have developed and applied a two-step "test" to determine whether a prior art reference is "analogous" art and therefore may be used as evidence with respect to a question of obviousness under § 103. *See In re Oetiker*, 977 F.2d 1443, 1447 (Fed. Cir. 1992); *In re Clay*, 966 F.2d 656, 659 (Fed. Cir. 1992); *In re Wood*, 599 F.2d 1032 (CCPA 1979). Step 1 requires an answer to the following question: "Is the reference within the field of the inventor's endeavor?" If the answer is "yes," then the reference is "analogous" and therefore may be used as evidence. If the answer is "no," then Step 2 requires an answer to the following question: "Is the reference reasonably pertinent to the particular problem the inventor was trying to solve?" If the answer is "yes," then the reference is analogous and therefore may be used as evidence.

Haines and Manduley are analogous art because, like the '216 patent, they relate to systems for remotely permitted use of software on a device. Ex. 1007 ¶ 59. The scope of the '216 patent is not limited to personal computers, but, rather, any "platform" on which software runs. Ex. 1001, 2:52–55 ("In broad terms, the system according to the invention is designed and adapted to allow digital data or software to run in a use mode on a

43

IPR2014-01453
Patent 5,490,216 C2

platform . . . ."), 2:24–30 ("[T]he term 'platform' denotes an environment to be associated with a computer device such as a microprocessor or other data processing device which permits execution of the digital data . . . ."). Even if the Haines and Manduley references could be considered in a different field of endeavor than the '216 patent because their intended use is postage and parcel systems rather than a personal computer, they are analogous art for the additional reason that they relate to the problem of restricting access to software to those who have a right to use it. Ex. 1001, 2:40–44 ("In this specification, 'use mode' refers to use of the digital data or software by its execution on a platform so as to fulfill the seller's/licensor's obligations in relation to the sale or license of the right to execute the digital data or software in the use mode."); Ex. 1005, Abstr., 1:41–49 ("only authorized meter reconfigurations can occur"), 11:13–17; Ex. 1006, Abstr, 1:29–32 ("the marketer may wish to charge the customer a separate amount for each software function or each variety of data and the customer may wish to pick and choose among the functions and/or varieties"), 2:31–63.

Petitioner demonstrates by a preponderance of the evidence that Haines discloses a "registration system" as recited in the preamble of claim 12 and construed in the table above. Pet. 48–49. The reconfiguration process of Haines is a licensing procedure because it is a system that provides security for the authorized use of software features. Ex. 1005, 1:45–47, 4:17–26; *see* Pet. 48–49. Patent Owner argues that Haines does not disclose a registration system "because it does not disclose any licensing procedure that must be followed by a prospective user," citing paragraph 172 of the DiEuliis Declaration. PO Resp. 56. The argument appears to be that there is no *ipsis verbis* disclosure of the term "license" in Haines

44

IPR2014-01453
Patent 5,490,216 C2

because Haines does disclose a system to protect authorized use. Dr. DiEuliis acknowledged that licensing means you have obtained permission to use something. Ex. 1048, 106:6–8 ("Licensing is, if you buy a — a product, a software product, and you have the license to use it, which means you're allowed to use it."). Accordingly, the preponderance of the evidence is that Haines discloses a registration system as recited in claim 12.

Petitioner has shown by a preponderance of the evidence that Haines's registration system, as modified by Manduley, generates "a security key from information input to said software", as required by claim 12. Pet. 46–52. Haines's registration system generates a "request code" from the meter serial number, other meter-specific information, and user-entered information. Ex. 1005, 5:1–6:48. The request code generated in Manduley's registration system reflects user-entered location data. Ex. 1006, 5:63–6:50 ("zip code or other data identifying the location"); *see* Ex. 1001, Fig. 4 ("ADDRESS," "CITY," and "ZIP/POST CODE" listed as examples of personal information inputs), 5:10–12. The preponderance of the evidence shows that one of ordinary skill in the art would have considered it obvious to have modified Haines by substituting information inputs disclosed in Haines for generating the "request code" with Manduley's input of a zip code "which uniquely identifies an intended registered user of said software on a computer on which said software is to be installed", as further recited by claim 12, for the reason disclosed in Manduley. Pet. 46–48; Ex. 1007 58–63. Manduley itself discloses the benefit of user-entered location data as allowing the data center to determine the customer's identity. Ex. 1006, 7:63–8:2 (the location data entered by the user is used to "determine[] the identity of the customer holding that

45

IPR2014-01453
Patent 5,490,216 C2

device"). Dr. Madisetti states that substitution of the inputs used in Haines is contemplated by Haines, particularly with respect to "other meter specific identifying information". Ex. 1007 ¶ 61 (quoting Ex. 1005, 5:28–30). According to Dr. Madisetti's testimony, using Manduley's device zip code, or other location data, instead of Haines's ascending register value, is nothing more than simple substitution of one known element for another and that the modification would achieve the result described by Manduley without undue experimentation. *Id.* ¶¶ 61–63.

The preponderance of the evidence also shows that Haines's registration system, as modified by Manduley, is "replicated at a registration authority and used for the purposes of checking by the registration authority that the information unique to the user is correctly entered at the time that the security key is generated by the registration system" as further required by claim 12. Haines explicitly states that the request code "is checked by the data center computer which generates the configuration request code using the same algorithm." Ex. 1005, Abstr., 1:59–64, 4:17–26.

Patent Owner's argument regarding the "owner of the business or home" rather than the "agent" in Haines being the "intended registered user" as recited in claim 12 is not persuasive. Manduley explicitly teaches "the user enters data". Ex. 1006, 6:39–41. Who can be properly characterized as the "intended registered user" of the registration system in Haines and Manduley is not relevant. It is the teachings of the references regarding a registration system that are pertinent to the obviousness analysis of claim 12. Dr. DiEuliis conceded that the person entering information in the registration system of claim 12 is irrelevant. Ex. 1041, 111:17–22 ("There's no explicit

46

IPR2014-01453
Patent 5,490,216 C2

reference to [] any one person entering this [user] information [of claim 12]").

We also are not persuaded by Patent Owner's argument regarding the degree of uniqueness that should be accorded a zip code in identifying the agent in Manduley (PO Resp. 57) because the claim construction analysis explicitly rejected "one-of-a-kind information that describes/identifies a person" when construing "information . . . which uniquely identifies an intended registered user" as recited in claim 12. Ex. 1008, 22.

### d. Obviousness of Claim 13

Claim 13 depends from claim 12 and further requires that "said security key is generated by a registration number algorithm." Ex. 1001, 50–51. Petitioner has shown that Haines's registration system explicitly states that a non-linear encryption algorithm is used to generate its request code. Pet. 52; Ex. 1005, 9:66–10:19 ("[T]he configuration request code and the configuration enable code are generated by an encryption routine, stored both in the meter ROM and in the data center computer. The encryption routine is a nonlinear algorithm that generates a number that is apparently random to an outside person."), 6:43–50.

Patent Owner contends that obviousness of claim 13 has not been shown because the Petition contradicts itself as to whether the "security key" recited in claim 13 is disclosed in Haines. PO Resp. 59 (citing Pet. 50, 52; Ex. 2008 ¶¶ 186–87). We have considered Patent Owner's argument and are not persuaded. Petitioner argues that one of ordinary skill in the art would have modified the registration system of Haines, particularly the request code generated in Haines, with the location input taught by Manduley. Pet.

47

46–53.  This is clear from the complete statements on pages 50 and 52 of the

Petition that Patent Owner cites:

> Haines does not expressly disclose that the configuration request
> code (i.e., security key) is generated from inputted information
> that is uniquely associated with a person who intends to become
> a licensee.  However, Manduley discloses generation of a request
> code that reflects user entered location data, such as the "zip code
> or other data identifying the location" of the device, which is
> used by the data center to "determine[] the identity of the
> customer holding that device."

*Id*. at 50, 52–53.  Therefore, the preponderance of the evidence

demonstrates that claim 13 would have been obvious in view of

Haines and Manduley.

### *e.  Obviousness of Claim 14*

Claim 14 depends from claim 13 and further requires that the

"registration number algorithm combines information entered by a

prospective registered user unique to that user with a serial number

generated from information provided by the environment in which the

software to be protected is to run."  Ex. 1001, 53–56.  Petitioner has shown

that Haines, as modified by Manduley's location data, generates a request

code, which includes information entered by a prospective register user

unique to that user and a meter serial number, using a non-linear encryption

algorithm.  Pet. 52–53; Ex. 1005, 5:1–6:50, 9:66–10:19; Ex. 1006, 5:39–

6:50, 7:63–8:2.

Patent Owner asserts that Petitioner's argument is flawed because

claim 14 depends from claim 13 and the analysis of whether Haines

discloses the required "security key" required by claim 13 is contradicted by

the analysis of claim 14.  PO Resp. 59 (citing Pet. 52–53).  Patent Owner

IPR2014-01453
Patent 5,490,216 C2

further contends that "Petitioners fail to point to any evidence that either *Haines* or *Manduley* discloses combining information 'provided by the environment in which the software to be protected is to run,' as recited in claim 14." *Id*. at 59–60 (citing Ex. 2008 ¶ 190).

For the reason explained above in connection with claim 13, we are not persuaded that Petitioner failed to show that the combination of Haines and Manduley discloses the "security key" recited in claim 13. Regarding the "information provided by the environment in which the software to be protected is to be run" recited in claim 14, Petitioner has shown that Haines discloses generating a request code from information that includes a meter serial number. Pet. 52, 47; Ex. 1005, 5:1–6:48; Ex. 1007 ¶ 60. Therefore, the preponderance of the evidence demonstrates that claim 14 would have been obvious in view of Haines and Manduley.

### f. Conclusion

In sum, the preponderance of the evidence shows that claims 12–14 would have been obvious over Haines and Manduley.

### D.    Conclusion

Petitioner has demonstrated by a preponderance of the evidence that (1) claims 1–11 and 17–20 of the '216 patent are anticipated under § 102(e) by Schull; (2) claims 10 and 11 of the '216 patent are unpatentable under § 103(a) over Schull; (3) claims 12–14 of the '216 patent are anticipated under § 102(e) by Logan; (4) claims 15 and 16 of the '216 patent are unpatentable under § 103(a) over the combination of Logan and Grundy; and (5) claims 12–14 of the '216 patent are unpatentable under § 103(a) over the combination of Haines and Manduley.

49

IPR2014-01453
Patent 5,490,216 C2

### III.    ORDER

In consideration of the foregoing, it is

ORDERED that claims 1–20 of the '216 patent are held to be unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to this proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

50

IPR2014-01453
Patent 5,490,216 C2

PETITIONER:

Eric A. Buresh
Mark C. Lang
ERISE IP, P.A.
eric.buresh@eriseip.com
mark.lang@eriseip.com

Don Daybell
James Maune
ORRICK, HERRINGTON & SUTCLIFFE LLP
d2dptabdocket@orrick.com
jmaune@orrick.com

PATENT OWNER:

Sean D. Burdick
Brett Mangrum
UNILOC USA, INC.
sean.burdick@unilocusa.com
brett@etheridgelaw.com

51

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,624 words, as determined by the word-count function of Microsoft Word 2010, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

/s/ *Daniel L. Geyser*
Daniel L. Geyser
   *Principal Attorney*
725 S. Figueroa Street, Suite 1830
Los Angeles, CA  90017
Tel.:  (213) 995-6811
Fax:  (213) 261-0299
*daniel.geyser@strismaher.com*

*Counsel for Appellants Uniloc USA, Inc. and Uniloc Luxembourg S.A.*

October 13, 2016

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2016, an electronic copy of the foregoing Corrected Opening Brief was filed with the Clerk of Court for the U.S. Court of Appeals for the Federal Circuit, using the appellate CM/ECF system. I further certify that all parties in the case are represented by lead counsel who are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Daniel L. Geyser*
Daniel L. Geyser
   *Principal Attorney*
725 S. Figueroa Street, Suite 1830
Los Angeles, CA  90017
Tel.:  (213) 995-6811
Fax:  (213) 261-0299
*daniel.geyser@strismaher.com*

October 13, 2016